FILED

2015 JUN -3 PM 3:29

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK O. WITTENMYER,<br>ROBERT MILAM,<br>LONNY REMMERS,<br>MARK ALLER,<br>DOUGLAS BOYCE,<br>ARVEL RAY HENDERSON II,<br><br>Defendants. | ) | SECOND SUPERSEDING INDICTMENT<br><br>CASE NO. 3:14 CR 089<br>Title 18, Section 1349, United States Code;<br>Title 18, Section 1343, United States Code;<br>Title 18, Sections 1957(a) and 2, United States Code;<br>Title 18, Section 1029(a)(2), United States Code;<br>Title 18, Section 1956(h), United States Code;<br>Title 15, Sections 78j(b) and 78ff, United States Code; and<br>Title 17, Section 240.10b-5, United States Code |

The Grand Jury charges:

## General Allegations

At all times relevant to this Indictment:

ORIGINAL

1. Defendant MARK O. WITTENMYER (hereinafter, Defendant WITTENMYER, or WITTENMYER) was a resident of Maumee, Ohio, and later Holland, Ohio, located within the Northern District of Ohio.

2. Defendant ROBERT MILAM (hereinafter, Defendant MILAM, or MILAM) was a resident of League City, Texas.

3. Defendant LONNY REMMERS (hereinafter, Defendant REMMERS or REMMERS) was a resident of Corona, California.

4. Defendant MARK ALLER (hereinafter Defendant ALLER, or ALLER) was a resident of Birmingham, Michigan, and, at times, California.

5. Defendant DOUGLAS BOYCE (hereinafter, Defendant BOYCE, or BOYCE) was a resident of Maumee, Ohio.

6. Defendant ARVEL RAY HENDERSON (hereinafter, Defendant HENDERSON, or HENDERSON), was a Realtor licensed in the State of Ohio, and was a resident of Holland, Ohio.

7. FTL Properties Limited was an Ohio corporation created in 2002 for the purpose "to conduct the business of acquiring, leasing, and managing real estate properties."

8. The listed address for FTL Properties Limited was 3306 Executive Parkway, Suite 101, Toledo, Ohio.

9. PNC Bank headquartered in Pittsburgh, Pennsylvania, maintained branches within the Toledo, Ohio, area.

10. An account was maintained at PNC Bank under the name Arvel Ray Henderson II, dba FTL Properties, under account no. XX-XXXX-4617 (the 4617 account).

11. The Federal Home Loan Mortgage Corporation, also known as Freddie Mac, had issued interest-only bonds identified by CUSIP numbers ending in GM5, HR9, and 2MI (the "Freddie Mac bonds").

12. Defendant WITTENMYER was not licensed by any Federal or state authority to sell or broker securities, or to otherwise engage in transactions involving securities.

13. At various times, WITTENMYER held ownership or investment interests in companies, including but not limited to Spring Valley Marketing Group (SVMG), Community ISP (CISP), Momentum Management, OnLetterhead, bSecured Solutions (bSS), New Dimension Fund (NDF), Oak Valley Leasing (OVL), Tech Ventures (TV) and RM Capital.

14. Using RM Capital and other entities, Defendant MILAM conducted and attempted to conduct transactions with WITTENMYER involving bank notes, long-and medium-term notes, and foreign securities, and MILAM and WITTENMYER collected funds for travel expenses, legal fees, and investments in these deals.

15. Defendant REMMERS claimed to be pastor of the Heart of Worship Church, in Corona, California, and was involved in and operated entities known as the Ananais World Fund and Fire Escape Ministries.

16. REMMERS was involved with WITTENMYER and ALLER in the operation of the New Dimension Fund.

17. Defendant BOYCE worked for WITTENMYER as an in-house accountant in connection with SVMG, CISP, Momentum Management, OnLetterhead, and bSS, among others.

**COUNT 1**
**(Conspiracy, 18 U.S.C. § 1349)**

The Grand Jury further charges:

18. The allegations of Paragraphs 1 through 17 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

19. From in or around January 2003, and continuing through approximately May 14, 2014, in the Northern District of Ohio, Western Division, and elsewhere, Defendants MARK O. WITTENMYER, ROBERT MILAM, LONNY REMMERS, MARK ALLER, and DOUGLAS BOYCE, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree together to commit offenses against the United States, that is, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343; that is, devising a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and using the mails, and interstate and foreign wire communications in execution of the scheme and artifice.

Object of the Conspiracy

20. It was the object of the conspiracy that Defendants WITTENMYER, MILAM, REMMERS, ALLER, and BOYCE, and others, enriched themselves by soliciting and collecting investments, expenses, consulting fees, salaries and other payments in connection with investment and financing transactions induced by false and fraudulent pretenses, representations, and promises.

Manner and Means

The following acts were parts of the conspiracy:

**Spring Valley Marketing Group (SVMG)**

21. SVMG was formed in 1993 by WITTENMYER and another individual in order to sell bundled packages of long distance telephone service to businesses at a discount.

22. As early as 1995, WITTENMYER began selling percentages of his income from SVMG for approximately $100,000 for each per cent of income; ultimately, he sold approximately 15 % of his SVMG income to as many as nine individual investors.

23. SVMG collapsed with the bankruptcy in July 2002 of MCI/WorldCom; despite SVMG having no business activity, except for small amounts of commission income, WITTENMYER continued to use the SVMG bank account as his personal account, in order to hide funds from creditors, and to launder investments received for succeeding businesses and programs.

24. The investors who purchased shares of SVMG income received only a fraction of the return promised by WITTENMYER.

**Community ISP (CISP)**

25. In 1997, WITTENMYER and another individual known to the Grand Jury founded CISP to act as an internet service provider.

26. WITTENMYER falsely promised investors in CISP returns of 400-500 per cent that would result from an initial public offering (IPO).

27. WITTENMYER and his co-owner took loans from CISP of over $2.0 million, and raised approximately $7.0 million from the sale of their personal shares in CISP, all of which

funds WITTENMYER and his co-owner used personally and not for the benefit or development of CISP.

28. In January 2002, WITTENMYER sold his interest in CISP to his co-owner. In recent years, CISP investors were paid one cent per share, shares they had purchased at $10 each.

**Momentum Management (Momentum)**

29. In 2002, WITTENMYER formed Momentum as a platform to market FAST technology, an internet search engine being developed by a Norwegian company.

30. WITTENMYER raised hundreds of thousands of dollars from investors in Momentum, issuing cognovit and promissory notes while offering very high rates of return.

31. In particular, in January 2002, WITTENMYER borrowed $1.5 million for Momentum from one individual, promising him as much as a 500 per cent return on the loan. He also borrowed $500,000 from another individual for Momentum.

32. WITTENMYER used the borrowed funds largely for personal expenses, and he never acquired the FAST technology. WITTENMYER did not make payments on the loans until he was sued. In or around 2009, he settled lawsuits from at least one lender.

33. WITTENMYER ultimately turned Momentum over to the creditor that had provided the $1.5 million loan.

**OnLetterhead**

34. In 2004, WITTENMYER purchased OnLetterhead, an email branding company. After he purchased a controlling interest in the company, WITTENMYER began to sell shares in the company, promising very high rates of return. He also issued shares in OnLetterhead to disgruntled Momentum investors.

35. BOYCE, WITTENMYER'S accountant, often transferred investor funds to the SVMG account, which account WITTENMYER used for personal expenses.

36. When WITTENMYER's partners in OnLetterhead discovered that he had transferred $1.2 million in OnLetterhead funds for his personal use, the partners threatened to report his misuse of OnLetterhead funds to law enforcement. Thereafter, WITTENMYER paid a settlement and agreed to leave the company. WITTENMYER used funds from investors in a successor WITTENMYER company to pay OnLetterhead investors.

**bSecured Solutions LLC (bSS)**

37. In 2006 WITTENMYER formed bSS, a company that was intended to purchase an internet security technology from 2Factor, a Maryland company. The technology was designed to greatly enhance the security of online financial transactions.

38. WITTENMYER raised approximately $10 million for bSS, promising investors that they would make hundreds of millions of dollars within months, and falsely representing that he had deals in place with companies such as Fujitsu, Google, Intel, Qualcomm, Nokia, and other tech firms.

39. WITTENMYER used most of the money received from investors for personal living expenses and payment of debts, many such debts arising from prior defunct enterprises.

40. WITTENMYER diverted approximately $1.9 million in bSS investor funds to his SVMG account, and another account for a non-existent company known as OVL. BOYCE, knowing that WITTENMYER was diverting investor funds, executed the transactions.

41. In or around March 2007, MARK ALLER joined bSS as chief financial officer, and was expected by WITTENMYER to secure additional investors.

42. Despite raising approximately $10 million, WITTENMYER never successfully brought the technology to market, and he essentially abandoned the project in or around 2008.

43. Even after bSS failed, due to losing the technology rights, WITTENMYER and ALLER continued to solicit and receive investments in bSS.

44. Generally WITTENMYER did not pay returns to investors, although he did pay a few who filed lawsuits, using funds he received from investors in later ventures.

**New Dimension Fund (NDF)**

45. In 2008, WITTENMYER, ALLER, and LONNY REMMERS formed NDF. WITTENMYER placed his interest in NDF in a shell company known as Tech Ventures.

46. WITTENMYER, ALLER, and REMMERS formed NDF purportedly to create "asset collateralization platforms" intended to "monetize" non-liquid assets, such as mineral fields; the assets would be "covered" by "insurance wraps" or bonds, against which banks would lend money. The money would be split between the asset-holder and NDF.

47. WITTENMYER induced a Toledo-area real estate developer to provide $2.0 million in seed money for NDF, with a promised return of $10 million within a year. WITTENMYER falsely told the developer that NDF held approximately $400 billion in "hard assets," and further told the developer that from this pool of hard assets, the developer would be provided $50 million for future developments.

48. On or about July 28, 2009, the developer wired $2.0 million to an attorney for NDF. Within a day of receipt, WITTENMYER, ALLER, and REMMERS split $750,000 of the funds, thus diverting them from NDF.

49. NDF lost $500,000 of the $2.0 million in an unrelated, speculative, high-risk investment. WITTENMYER, ALLER, and REMMERS split the balance of the remaining funds, again diverting them from NDF.

50. WITTENMYER, ALLER, and REMMERS never collateralized any assets, and the developer received nothing for his $2.0 million in seed money.

**RM Capital/Foreign Bank Note and BondTrading/Bank Guarantees**

51. In or around 2009, WITTENMYER partnered with ROBERT MILAM and MILAM's business, RM Capital, to engage in schemes in which they offered to investors foreign bank notes, medium- and long-term bonds, and bank guarantees. Although WITTENMYER and MILAM held no ownership interest in, or control over, these investment vehicles, they offered investors large shares of the transactions once they closed.

52. WITTENMYER and MILAM received approximately $425,000 from investors by falsely representing to investors that these notes, bonds, and guarantees were genuine.

53. WITTENMYER continued to solicit funds from transactions in notes, bonds, and bank guarantees. In November 2013, WITTENMYER solicited and obtained a $500,000 consultancy fee from an investment group in connection with certain Freddie Mac interest-only bonds. WITTENMYER falsely represented that he was entitled to the fee, which he directed through a PNC Bank account under the name Arvel Ray Henderson II, dba FTL Properties.

54. From January through April 2014, WITTENMYER continued to entice and lure prospective investors into participating in various bond, note and bank guarantee transactions.

**Nature of False Statements and Misrepresentations**

55. As part of the conspiracy, WITTENMYER made false statements to investors, lenders, and other participants regarding his past success in arranging investment transactions, and regarding his purported sales of an internet company and a telecommunications company.

56. As part of these schemes, WITTENMYER often fraudulently requested that investors and lenders to advance him travel, legal fees, and other expenses in order to "close" deals.

57. WITTENMYER often falsely represented to investors and lenders that proceeds of pending transactions had been received, and were pending release from trust accounts or other bank accounts.

58. WITTENMYER used the participation, and purported participation, of attorneys and other professionals to confer an aura of legitimacy on his transactions.

59. WITTENMYER made false statements regarding the investments offered, e.g., telling investors they were purchasing shares of a company or venture while later claiming they were purchasing his personal shares.

60. WITTENMYER falsely stated to investors that he would use their funds for business ventures when, in fact, he used the investor funds for personal living expenses.

61. WITTENMYER failed to disclose his prior business failures to investors and lenders.

Acts in Furtherance of the Conspiracy

62. In furtherance of the conspiracy, and to effect the objects thereof, WITTENMYER, MILAM, REMMERS, ALLER, and BOYCE, together with others known and unknown to the Grand Jury, committed the following acts in the Northern District of Ohio, Western Division, and elsewhere:

a. On or about June 22, 2006, WITTENMYER induced CW to invest $100,000 in bSS;

b. On or about June 22, 2006, BOYCE signed bSS check #'s 2004 and 2005, which were issued to SVMG in the amount of $35,000 and $20,000 respectively;

c. On or about June 23, 2006, BOYCE signed bSS check# 2006, in the amount of $10,000 issued to WITTENMYER;

d. On or about June 26, 2006, BOYCE signed bSS check# 2009, issued to SVMG in the amount of $27,000;

e. On or about July 6, 2006, WITTENMYER induced CW to invest another $100,000 in bSS;

f. On or about July 7, 2006, WITTENMYER induced DV to invest $100,000 in bSS;

g. On or about August 2, 2006,WITTENMYER induced MP to invest $475,000 in bSS;

h. On or about August 7, 2006, WITTENMYER induced LA to invest $100,000 in bSS;

i. On or about January 16, 2007, WITTENMYER induced MP to invest $300,000 in bSS;

j. On or about February 20, 2007, WITTENMYER induced SN to invest $250,000 in bSS;

k. On or about September 11, 2007, WITTENMYER induced LM to invest $200,000 in bSS;

l. On or about October 17, 2007, WITTENMYER induced JJI to invest $150,000 in bSS;

m. On or about October 17, 2007, WITTENMYER, signing a Customer Transfer Ticket, transferred $80,000 from bSS to the SVMG account he was using;

n. On or about October 17, 2007, WITTENMYER and BOYCE transferred $60,000 from bSS to OVL;

o. On or about October 26, 2007,WITTENMYER induced MJD to invest $250,000 in bSS;

p. On or about November 16, 2007, WITTENMYER induced MP to invest $1.0 million in bSS;

q. Also on or about November 16, 2007, WITTENMYER transferred $1.0 million from a bSS account, to the SVMG account controlled by him;

r. On or about November 30, 2007, WITTENMYER withdrew $80,000 in cash from the SVMG account at Charter One Bank slip;

s. On or about November 30, 2007, BOYCE deposited $30,000 in cash into the OVL account;

t. On or about November 30, 2007, BOYCE deposited $50,000 in cash into an account in the name Villa Interiors;

u. On or about December 31, 2007, WITTENMYER induced MP and JP to invest $1.0 million in bSS;

v. On or about January 2, 2008, BOYCE transferred $1.0 million from a bSS account, to the SVMG account controlled by WITTENMYER;

w. On or about March 17, 2008, WITTENMYER transferred $1.65 million to an account controlled by GW, an attorney whose identity is known to the Grand Jury;

x. On or about October 15, 2008, WITTENMYER induced MP and JP to invest $100,000, which was deposited in a Tech Ventures (TV) account;

y. On or about December 15, 2008, WITTENMYER induced MP and JP to invest $111,000, which was deposited in a TV account;

z. On or about March 9, 2009, after $10,000 was wired from the company DI , BOYCE withdrew $6,000 in three separate $2,000 cash withdrawals, and deposited that cash into the OVL account controlled by WITTENMYER;

aa. On or about March 30, 2009, WITTENMYER induced FK to invest $90,000, which was transferred by wire to a TV account;

bb. On or about March 30, 2009, after FK invested $90,000 in TV, BOYCE withdrew $24,900 from the TV account and deposited $20,000 in cash into the OVL account controlled by WITTENMYER;

cc. On or about March 31, 2009, BOYCE deposited $20,000 in cash in the OVL account;

dd. Until approximately mid-2009, ALLER assured SB, a bSS investor, that bSS was still viable and that all was well with that company;

ee. On or about May 28, 2009, WITTENMYER induced FK to invest $185,000 in bSS;

ff. Also on May 28, 2009, WITTENMYER transferred $185,000 from a bSS account to a TV account;

gg. On or about July 2, 2009, WITTENMYER caused $25,000 to be wired from investor CW to a TV account;

hh. On or about July 28, 2009, WITTENMYER caused $2.0 million to be wired from investor LD, and his company DI, to an account controlled by an attorney for the NDF;

ii. Also on or about July 28, 2009, the attorney for NDF transferred by wire from investor LD's funds, the amounts of $100,000 to OVL, $150,000 to Trace Ventures, $200,000 to TV, $300,000 to Fire Escape Ministries, and $1,299,750 to NDF;

jj. On July 28, 2009, the attorney for NDF transferred by wire $150,000 to Trace Ventures Associates, LLC, a company controlled by ALLER;

kk. On July 30, 2009, the attorney for NDF transferred by wire $300,000 to Fire Escape Ministries, a company controlled by REMMERS;

ll. On or about September 24, 2009, after MP invested $70,000 in Tech Ventures on September 24, 2009, BOYCE withdrew $45,250 in cash from the Tech Ventures account;

mm. On October 30, 2009, the attorney for NDF issued a check for $43,000 to Trinity World Holdings, LLC, a company controlled by REMMERS;

nn. On November 2, 2009, the attorney for NDF wired $30,000 from the NDF account to ALLER's Trace Ventures Associates, LLC account;

oo. On or about March 3, 2010, ALLER sent an email to a bSS investor, criticizing the investor for contacting other bSS investors;

pp. Also on or about March 3, 2010, ALLER told bSS investor SB that Tech Ventures was involved in "negotiations regarding a technology transaction for several months," and the status of the transaction was not "the business of" the bSS investors;

qq. On or about March 9, 2010, WITTENMYER caused $10,000 to be wired from DI to a SVMG account;

rr. In or around August 2010, MILAM introduced investor PC to WITTENMYER;

ss. On or about September 2, 2010, WITTENMYER arranged for $175,000 to be wired from investor PC to the company DI;

tt. At some time prior to December 2010, MILAM introduced investor CS to WITTENMYER;

uu. On or about April 12, 2011, WITTENMYER caused investor CS to wire $10,000 to WITTENMYER so the latter could travel from London to Hong Kong to facilitate a medium term note deal;

vv. In approximately May 2011, WITTENMYER falsely represented to investor CS that WITTENMYER's wife had attempted suicide, and requested that CS give him $5,000 so WITTENMYER could fly home from London;

ww. On or about December 8, 2011, WITTENMYER and MILAM caused $20,000 to be wired from investor WB to RM Capital;

xx. On or about December 9, 2011, MILAM wired funds from the RM Capital account to a member of WITTENMYER's family, and to and attorney;

yy. On or about December 21, 2011, WITTENMYER and MILAM caused $20,000 to be wired from investor WB to RM Capital;

zz. On or about December 21, 2011, MILAM wired funds from the RM Capital account to WITTENMYER family members;

aaa. On or about January 10, 2012, WITTENMYER and MILAM caused investor MK to wire $20,000 to the RM Capital account;

bbb. On or about February 3, 2012, WITTENMYER and MILAM caused investor MK to wire $10,000 to the RM Capital account;

ccc. On or about February 14, 2012, WITTENMYER and MILAM caused investor MK to wire $4,500 to the RM Capital account;

ddd. On April 6, 2012, WITTENMYER told investor MK that WITTENMYER's attorney had $17.3 million in the attorney's account that would be distributed to investors on April 9, 2012;

eee. On approximately August 4, 2012, WITTENMYER told investor WB that WITTENMYER had $185,000 in WITTENMYER's attorney's trust account, and that money would be distributed to investors soon;

fff. On or about December 2, 2012, WITTENMYER told investor/lender IB that WITTENMYER had funds in his attorney's IOLTA account that would allow WITTENMYER to wire IB $30,000 the following day;

ggg. On or about November 8, 2013, WITTENMYER caused $500,000 to be wired from an investment group in Ontario, Canada, to the FTL Properties account at PNC Bank; and

hhh. From February 2014, through the date of return of this Superseding Indictment, WITTENMYER continued to attempt to receive fees and revenues from transactions in bonds and bank guarantees.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2 -9**
**Wire Fraud**
**(18 U.S.C. § 1343)**

The Grand Jury further charges:

63. The factual allegations in Paragraphs 1 through 17, and 20 through 62, are re-alleged and incorporated by reference as if fully set forth herein.

64. On or about the dates indicated below, in the Northern District of Ohio, Western Division, and elsewhere, Defendants MARK O. WITTENMYER, MARK ALLER, LONNY REMMERS, and ROBERT MILAM, having knowingly and intentionally devised and intended to devise a scheme and artifice to defraud investors, lenders, and others, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, that is, he caused funds to be transmitted by wire, as set forth below, each such wire transfer constituting a separate count of this Superseding Indictment:

| Defendant | Count | Date On or about | Approximate Amount | Transaction Description |
|---|---|---|---|---|
| WITTENMYER | 2 | 05/18/2009 | $20,000.00 | Wire transfer:<br>From investor s MP & JP<br>Findlay, OH<br>Order bank: Merrill Lynch, New York, NY,<br>Send Bank: Merrill Lynch, Jacksonville, FL<br>Debit: (-) a/c# 0261 Mellon |

| | | | | |
|---|---|---|---|---|
| | | | | Bank, Pittsburgh, PA<br>Credit: (+) a/c# 3755, Tech V, Maumee, Ohio |
| WITTENMYER | 3 | 05/28/2009 | $185,000.00 | Wire transfer:<br>From investor FK, Chicago, IL, To bSS, Maumee, OH<br>Debit: (-) a/c# 3267, First Bank routing# 9428, Creve Coeur, MO<br>Credit: (+) bSS, a/c# 0155, Charter One, Maumee, OH |
| WITTENMYER<br>ALLER<br>REMMERS | 4 | 07/28/2009 | $2,000,000.00 | Wire transfer:<br>From company DI, Maumee, OH, to PK, CA<br>Debit: (-) Bank of Maumee routing# 5812, a/c# 2368, Maumee, OH<br>Credit: (+) PK, BOA a/c# 0338, Newport Beach, CA |
| WITTENMYER<br>MILAM | 5 | 03/18/2010 | $3,500.00 | Wire transfer<br>From MILAM, League City, TX, to SVMG, Maumee, OH<br>Debit: (-) Wells Fargo Bank routing# 0248, San Francisco, CA<br>Credit: (+) SVMG, a/c# 9815, Charter One Bank, Maumee, OH<br>(Wells Fargo processes wire transfers through Minneapolis, MN) |
| WITTENMYER<br>ALLER<br>REMMERS | 6 | 09/02/2010 | $175,000.00 | Wire transfer:<br>From investor PC, OKC, OK to company DI, Maumee, OH<br>Debit: (-) First American Bank, a/c# 5903, Purcell, OK<br>Credit: (+) Bank of Maumee, a/c# 2368, Maumee, OH |
| WITTENMYER | 7 | 09/02/2010 | $90,000.00 | Wire transfer:<br>From company DI, Maumee, OH to OVL, LLC, Maumee, |

| | | | | |
|---|---|---|---|---|
| | | | | OH Debit: (-) Dillin Investments, Maumee, OH<br>Credit: (+) First Federal a/c# 2139, Defiance, OH<br>(Citizens Bank/Charter One processes all wire transfers through Riverside, RI) |
| WITTENMYER MILAM | 8 | 12/10/2010 | $100,000.00 | Wire transfer:<br>From investor CS via GS, to OVL, Maumee, OH<br>Debit: (-) East West Bank, a/c# 3156, El Monte, CA<br>Credit: (+) First Federal Bank, a/c# 2139, Defiance, OH |
| WITTENMYER | 9 | 11/08/2013 | $499,980.00 | Wire transfer<br>From PL, Canada, 2975319 Canada Inc, 4740 Cote Vertu West, Saint Laurent, QC, CA<br>To Arvel Ray Henderson II, dba FTL Properties account, PNC Bank Maumee, OH<br>Debit: (-) a/c# 2918, Canadian Imperial Bank, Toronto Canada<br>Credit: (+) a/c# 461, PNC Bank a/c# 4617, Toledo, OH |

In violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS 10 - 41**
**Money Laundering**
**(18 U.S.C. §§ 1957(a) and 2)**

The Grand Jury further charges:

65. The factual allegations of Paragraphs 1 through 17, and 20 through 62, of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

66. On or about the dates indicated below, each monetary transaction representing a separate count of this Superseding Indictment, in the Northern District of Ohio, Western

Division, and elsewhere, Defendant MARK O. WITTENMYER knowingly engaged, attempted to engage, and caused others to engage, in the monetary transactions described below, by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of values greater than $10,000, such property having been derived from specified unlawful activity, that is wire fraud in violation of Title 18, United States Code, Section 1343:

| Count | Date On or about | Approximate Amount | Transaction Description |
|---|---|---|---|
| **10** | 06/01/2009 | $20,000.00 | Transfer of funds from TV, Charter One a/c# 3755, to OVL, Charter One a/c# 4088 |
| **11** | 06/12/2009 | $317,222.22 | Withdrawal from GW's Waterford Bank a/c# 1825 |
| **12** | 05/28/2009 | $50,000.00 | Transfer of funds TV, Charter One a/c# 3755, to OVL, Charter One a/c# 4088 |
| **13** | 05/28/2009 | $25,000.00 | Transfer from TV, Charter One a/c# 3755, To VMH, a/c# 0156 |
| **14** | 05/28/2009 | $20,000.00 | Transfer from TV, Charter One a/c# 3755, To TrV, HNB a/c# 8410 |
| **15** | 07/28/2009 | $59,700.00 | Transfer From TV, Charter One a/c# 3755, To GW's Waterford Bank a/c# 1825 |
| **16** | 07/28/2009 | $100,000.00 | Transfer from PK, BOA a/c# 0338, To OVL, Charter One a/c# 4088 |
| **17** | 07/28/2009 | $150,000.00 | Transfer from PK, BOA a/c# 0338, To TrV, HNB a/c# 8410 |
| **18** | 07/28/2009 | $200,000.00 | Transfer from PK, BOA a/c# 0338, To TV, Charter One a/c# 3755 |
| **19** | 07/28/2009 | $300,000.00 | Transfer from PK, BOA a/c# 0338, To FEM, BOA a/c# 9562 |
| **20** | 07/28/2009 | $1,229,750.00 | Transfer from PK, BOA a/c# 0338, To NDF, BOA a/c# 6572 |
| **21** | 08/05/2009 | $100,000.00 | Transfer from NDF, BOA a/c# 6572, To TV, Charter One a/c# 3755 |
| **22** | 08/13/2009 | $60,478.90 | Transfer from TV, Charter One a/c# 3755, To BI a/c# 8328 |
| **23** | 09/29/2009 | $45,250.00 | Transfer from TV, Charter One a/c# 3755, To OVL, Charter One a/c# 4088 |
| **24** | 10/30/2009 | $75,000.00 | Transfer from NDF, BOA a/c# 6572, To TV, Charter One a/c# 3755 |
| **25** | 10/30/2009 | $40,000.00 | Transfer from TV, Charter One a/c# 3755, To OVL, Charter One a/c# 4088 |

| | | | |
|---|---|---|---|
| **26** | 11/13/2009 | $45,000.00 | Transfer from NDF, BOA a/c# 6572,<br>To TWH<br>(Memo: 11/13/09 Loan) |
| **27** | 11/23/2009 | $40,000.00 | Transfer from NDF, BOA a/c# 6572,<br>To TV, Charter One a/c# 3755 |
| **28** | 11/23/2009 | $25,000.00 | Transfer from TV, Charter One a/c# 3755,<br>To OVL, Charter One a/c# 4088 |
| **29** | 12/10/2009 | $45,000.00 | Transfer from NDF, BOA a/c# 6572,<br>To TV, Charter One a/c# 3755 |
| **30** | 12/11/2009 | $25,000.00 | Transfer from TV, Charter One a/c# 3755,<br>To OVL, Charter One a/c# 4088 |
| **31** | 12/22/2009 | $20,000.00 | Transfer from NDF, BOA a/c# 6572,<br>To TV, Charter One a/c# 3755 |
| **32** | 01/02/2010 | $15,000.00 | WITTENMYER Out of State (Northern District of Ohio) Counter Withdrawal from NDF, BOA a/c# 6572 |
| **33** | 12/09/2011 | $12,000.00 | Transfer from RM Capital, Compass Bank a/c# 5260<br>To MRW a/c# 3697 |
| **34** | 11/12/2013 | $50,000.00 | Withdrawal from FTL, PNC a/c# 4617 |
| **35** | 11/14/2013 | $20,000.00 | Withdrawal from FTL, PNC a/c# 4617 |
| **36** | 11/14/2013 | $50,000.00 | Transfer From AM, a/c# 8488, To BPC, a/c# 2315 |
| **37** | 11/18/2013 | $21,951.00 | Transfer via debit card from the FTL, PNC a/c# 4617,<br>To Ritz Carlton, Fort Lauderdale, FL |
| **38** | 11/20/2013 | $20,000.00 | Withdrawal from FTL, PNC a/c# 4617 |
| **39** | 11/20/2013 | $50,000.00 | Transfer from FTL, PNC a/c# 4617,<br>To Aria Resort/Casino, Las Vegas, NV |
| **40** | 12/02/2013 | $21,260.00 | Withdrawal from FTL, PNC Bank a/c# 4617,<br>via ck# 28584 issued to cash |
| **41** | 12/23/2013 | $23,000.00 | Withdrawal from FTL, PNC Bank a/c# 4617t |

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

**<u>Count 42-47</u>**
**(Securities Fraud**
**15 U.S.C. §§ 78j(b) and 78ff)**

The Grand Jury further charges:

67. The allegations of Paragraphs 1 through 17, and 20-62, of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

At all times material to these Counts of the Superseding Indictment:

68. Defendant MARK O. WITTENMYER solicited funds from individuals for ownership interests, shares of proceeds of transactions, participation in the proceeds of investment transactions, and/or the advance of legal fees and expenses to close on investment transactions.

69. WITTENMYER misrepresented to prospective investors his success in concluding past transactions.

70. WITTENMYER misrepresented to prospective investors about the value of assets that he and his associated had under their control.

71. WITTENMYER misled investors about attorneys, law firms, brokerage firms and other investment professionals allegedly involved in WITTENMYER's purported transactions.

72. WITTENMYER regularly disregarded corporate formalities, commingling funds between him and various business entities.

73. WITTENMYER falsely advised investors that transactions had closed, that funds were in escrow, that funds were in his attorneys' trust accounts, and that he was about to transfer funds to the investors.

74. Rather than investing funds in promised transactions, WITTENMYER loaned funds to himself, paid his own personal expenses, and made expenditures on lavish items such as travel, gifts, entertainment, meals, to settle lawsuits from prior transactions, and to repay previously lost investor funds.

75. On or about the dates indicated below, in the Northern District of Ohio, Western Division, and elsewhere, WITTENMYER, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly,

would and did use and employ in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

a. Employing devices, schemes, and artifices to defraud;

b. Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements true, in the light of circumstances under which they were made, not misleading;

c. Engaging in acts, practices, and courses of business which operated and would as a fraud upon investors, in connection with the purchase and sale of securities.

| Count | Date | Investor | Securities/Instrument |
|---|---|---|---|
| 42 | December 2010-January 2011 | CS | 25 (Purple LTNs) Brazilian National Treasury Bills |
| 43 | December 2011-January 2012 | WB | 4 Purple H Series Long-term Notes |
| 44 | September 2013-January 2014 | PG/JL/KW | 3 Freddie Mac Bonds |
| 45 | February-March 2014 | SS/DRD | HSBC Bank Guarantee: One Billion Euro |
| 46 | February-March 2014 | SS | Credit Agricole S.A. 25,000,000,000 Medium Term Note Programme |
| 47 | March 2014 | TA | HSBC Bank Guarantee: One Billion Euro |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations Section 240.10b-5.

**Count 48**
**Access Device Fraud**
**(18 U.S.C. § 1029(a)(2))**

The Grand Jury further charges:

76. At all times material to this count of the Superseding Indictment, IB, an individual whose identity is known to the Grand Jury, maintained an American Express credit card account.

77. In early September 2012, IB provided his American Express account number to MARK O. WITTENMYER, who told IB that the account would be used for travel money to close a "bond deal."

78. WITTENMYER used IB's American Express account number to incur, without IB's authorization, approximately $6,500 in personal expenses, that is, to pay past due and current rent on an apartment.

79. On or about September 6, 2012, in the Northern District of Ohio, Western Division, and elsewhere, WITTENMYER, knowingly and with intent to defraud, trafficked in and used one or more unauthorized access devices during any one year period, and by such conduct obtained anything of value aggregating $1,000 or more during that period, to wit: property and services valued at approximately $6,500 on an American Express credit card account, such conduct affecting interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 1029(a)(2).

**Count 49**
**Access Device Fraud**
**(18 U.S.C. § 1029(a)(2))**

The Grand Jury further charges:

80. At all times material to this count of the Superseding Indictment, WB, an individual whose identity is known to the Grand Jury, maintained an American Express credit card account ending in 4787.

81. On or about August 4, 2012, WB provided his American Express account number to MARK O. WITTENMYER, who told WB that the account would be used for travel expenses necessary to close a "bond deal," from which WITTENMYER expected to receive $6-7 million.

82. On or about August 4, 2012, shortly after providing the account number to WITTENMYER, WB told WITTENMYER not to use WB's American Express credit card account.

83. Between on or about August 4, 2012 to on or about August 12, 2012, WITTENMYER used WB's American Express credit card account to incur, without WB's authorization, approximately $23,843.94 in personal expenses.

84. From on or about August 4, 2012, and continuing thereafter to a date unknown to the Grand Jury, in the Northern District of Ohio, Western Division, and elsewhere, WITTENMYER, knowingly and with intent to defraud, trafficked in and used one or more unauthorized access devices during any one year period, and by such conduct obtained anything of value aggregating $1,000 or more during that period, to wit: fraudulently charged merchandise and services valued

at approximately $23,843.94, on an American Express credit card account ending in 4787, such conduct affecting interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 1029(a)(2).

**COUNT 50**
**Money Laundering**
**(18 U.S.C. §§ 1957 and 2)**

The Grand Jury further charges:

85. On or about November 23, 2009, in the Northern District of Ohio, Western Division, and elsewhere, Defendant MARK ALLER knowingly engaged, attempted to engage, and caused others to engage, in a monetary transaction, to wit: a wire transfer of $45,000 from the NDF account at Bank of America, to the Tech Ventures account at Charter One Bank, which transaction was by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section1343, all in violation of Title 18, United States Code, Sections 1957 and 2.

**COUNT 51**
**Money Laundering**
**(18 U.S.C. §§ 1957 and 2)**

The Grand Jury further charges:

86. On or about September 29, 2009, in the Northern District of Ohio, Western Division, and elsewhere, Defendant DOUGLAS BOYCE knowingly engaged, attempted to engage, and caused others to engage, in a monetary transaction , to wit: a cash withdrawal of $45,250 from Tech Ventures account at Charter One Bank, which transaction was by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity,

that is, wire fraud in violation of Title 18, United States Code, Section1343, all in violation of Title 18, United States Code, Sections 1957 and 2.

**COUNT 52**
**Money Laundering**
**(18 U.S.C. §§ 1957 and 2)**

The Grand Jury further charges:

87. On or about January 10, 2012, in the Northern District of Ohio, Western Division, and elsewhere, Defendant ROBERT MILAM knowingly engaged, attempted to engage, and caused others to engage, in a monetary transaction, to wit: a wire transfer of $16,500 from RM Capital account to account in the name of LM, at Fifth Third Bank, which transaction was by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Sections 1957 and 2.

**COUNT 53**
**Money Laundering Conspiracy**
**(18 U.S.C. § 1956(h))**

The Grand Jury further charges:

88. The allegations of Paragraphs 6 through 12 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

89. At all times material to this Count of the Indictment, Defendant HENDERSON maintained another account at PNC Bank, under account no. XX-XXXX-8488 (the 8488 account), and also maintained an account at Sun Trust Bank, account no. XXXXX-XXXX-4724 (the Sun Trust account).

90. From as early as December 2012, and continuing through on or about February 18, 2014, in the Northern District of Ohio, Western Division, and elsewhere, Defendants ARVEL RAY HENDERSON II, MARK O. WITTENMYER, and others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together to commit an offense against the United States, to wit: money laundering in violation of Title 18, United States Code, Section 1957, that is, to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derives property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud and securities fraud.

Object of the Conspiracy

91. It was the object of the conspiracy that Defendant HENDERSON, together with WITTENMYER and others, would and did spend approximately $630,000 in funds fraudulently obtained from a group of investors, and conceal and disguise their use of said funds through cash withdrawals, wire transfers, use of multiple bank accounts, cashiers' checks, and debit cards.

Manner and Means

92. It was a part of the conspiracy that WITTENMYER made false statements regarding his past success in arranging successful investment transactions involving "bank guarantees" and "medium term note deals."

93. It was a further part of the conspiracy that WITTENMYER falsely represented that he could deliver three Freddie Mac interest-only bonds to a group of investors, who could then resell the bonds at a substantial profit.

94. It was a further part of the conspiracy that WITTENMYER induced the group of investors to advance him travel and related expenses in order to facilitate the sale of the bonds.

95. It was a further part of the conspiracy that WITTENMYER, threatened to file a lien against the Freddie Mac bonds, in order to obtain a $1.0 million consulting fee.

96. It was a further part of the conspiracy that Defendant HENDERSON allowed the use of his FTL Properties account, the 4617 account, for the receipt of approximately $130,000 in travel and related expenses, and approximately $500,000 as a half payment of a consulting fee from the group of investors.

97. It was a further part of the conspiracy that HENDERSON and WITTENMER spent the funds they received as travel and related expenses, and the $500,000 consulting fee, through cash withdrawals, expenses by use of a debit card, wire transfers, and transfers to other accounts, over an approximate three-month period.

<u>Acts in Furtherance of the Conspiracy</u>

97. On or about October 30, 2013, $30,000 was transferred by wire from a representative of an investor group to HENDERSON'S 4617 account, as payment of travel and related expenses to "close" a transaction involving the Freddie Mac bonds.

98. On or about November 8, 2013, $499,980 was transferred by wire to HENDERSON's 4617 account from an investor group as payment of 50% of a consulting fee demanded by Wittenmyer to remove or eliminate a lien on the bonds.

99. On or about November 12, 2013, HENDERSON transferred $23,000 from his 4617 account to his 8488 account, also at PNC Bank.

100. On or about November 18, 2013, HENDERSON transferred by wire $50,000 from his 4617 account to the Aria Resort and Casino in Las Vegas, Nevada.

101. On or about November 20, 2013, HENDERSON withdrew approximately $20,000 from his 4617 account, at WITTENMYER's direction, to transfer funds to an associate of WITTENMYER who was involved in the Freddie Mac bond scheme.

102. On or about November 27, 2013, HENDERSON paid $13,145.64 for hotel accommodations at the ARIA Resort and Casino, which represented expenses incurred by HENDERSON, WITTENMYER, and individuals traveling with them.

103. On or about December 2, 2013, HENDERSON wrote a check to cash for $21,260 to be used for the purchase of jewelry for WITTENMYER's girlfriend.

104. On or about December 23, 2013, HENDERSON withdrew a total of $36,000 in cash from the 4617 account.

All in violation of Title 18, United States Code, Section 1956(h).

**<u>COUNT 54-58</u>**
**Engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. §§ 1957 and 2)**

The Grand Jury further charges:

105. The factual allegations of Paragraphs 6 through 12, 89, and 91 through 104, of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

106. On or about the dates indicated in the table below, each monetary transaction representing a separate count of this Indictment, in the Northern District of Ohio, Western Divison, Defendant ARVEL RAY HENDERSON II did knowingly engage, attempt to engage, and cause others to engage, in monetary transactions by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of values greater than $10,000, to wit: monetary transactions involving funds that had been deposited in the FTL Properties 4617

account at PNC Bank, such property having been derived from specified unlawful activity; that is, wire fraud, a violation of Title 18, United States Code, Section 1343:

| Count | Date | Amount | Description of Transaction |
|---|---|---|---|
| 54 | 11/12/2013 | $23,000 | Wire transfer from PNC 4617 account to PNC 8488 account. |
| 55 | 11/14/2013 | $50,000 | Wire transfer from PNC 8488 account to Sun Trust account |
| 56 | 11/18/2013 | $21,951 | Wire transfer from the PNC 4617 account to Ritz Carlton, Fort Lauderdale, FL |
| 57 | 11/26/2013 | $31,000 | Wire transfer from Aria Resort and Casino, Las Vegas, NV, to PNC 4617 account |
| 58 | 12/02/2013 | $21,260 | Exchange of cashier's check at Jared's Jewelers |

All in violation of Title 18, United States Code, Sections 1957 and 2.

A TRUE BILL.

Original document – Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002