UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                    Case No. 3:14-cr-89

                    Plaintiff

        v.                                                   MEMORANDUM OPINION


Arvel Ray Henderson, II,

                    Defendant


        This matter is before me on Defendant Arvel Ray Henderson's motion for judgment of

acquittal (Doc. No. 391) and renewed motion for judgment of acquittal or, in the alternative, a new

trial (Doc. No. 402).

        Henderson was tried to a jury on one count of conspiracy to commit money laundering and

four counts of engaging in monetary transactions in property derived from specified unlawful

activity.  (Doc. Nos. 103 at ¶¶ 88-106; 384).  On February 21, 2018, after the government rested its

case, Henderson filed his motion for judgment of acquittal.  (Doc. No. 391).  I took the motion

under advisement and gave the government time to respond in writing after closing arguments.  The

government filed its response on March 2, 2018.  (Doc. No. 399).

        On February 23, 2018, the jury found Henderson guilty on all five counts.  (Doc. No. 397).

On March 9, 2018, Henderson filed a renewed motion for judgment of acquittal or, in the

alternative, a new trial.  (Doc. No. 402).  On April 4, 2018, the government responded (Doc. No.

407), and Henderson replied on April 16, 2018 (Doc. No. 408).

        For the reasons that follow, I deny Henderson's motions.

## DISCUSSION

Henderson timely filed both a motion for acquittal (Doc. No. 391) and a renewed motion for acquittal or, in the alternative, a new trial (Doc. No 402). I take each in turn below.

**Motion for Judgment of Acquittal**

At the close of the government's case-in-chief, Henderson moved for judgment of acquittal. (Doc. No. 391). Henderson renewed this motion after he was found guilty on all five counts with which he was charged. (Doc. No. 402).

"After the government closes its evidence or after the close of all the evidence," a defendant may move for a judgment of acquittal, which the court must grant with respect to any offense "for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

A defendant challenging the sufficiency of the evidence "bears a very heavy burden." *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Garrido*, 467 F.3d 971, 984 (6th Cir. 2006). A motion for acquittal "will be confined to cases where the prosecution's failure is clear." *United States v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989) (citing *Burks v. United States*, 437 U.S. 1, 17 (1978)) (quotation marks omitted).

I may only reverse the judgment for insufficient evidence if that judgment "is not supported by substantial and competent evidence upon the record as a whole." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002) (quotation marks and citation omitted). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. The jury may draw any reasonable inferences from direct, as well as circumstantial, proof." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (internal quotation marks omitted and citation omitted); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (noting that "we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required"). But "[a]lthough circumstantial evidence alone can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008). I may not weigh the evidence, consider the credibility of witnesses, or substitute my own judgment for that of the jury. *Id.*

Henderson was convicted of five counts – one count of conspiracy to commit money laundering and four counts of engaging in a monetary transaction in property derived from specified unlawful activity. (Doc. No. 397). To prove Henderson engaged in a monetary transaction in property derived from specified unlawful activity, the government had to prove Henderson knowingly engaged "in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Here, the specified unlawful activity was wire fraud.

Henderson claims the evidence adduced at trial was insufficient to prove that the $500,000 wire transfer was proceeds of wire fraud and that Henderson knew the money was criminally-derived. (Doc. Nos. 391; 402-1 at 7-16; 408 at 10-21).[1]

I turn first to whether there was evidence sufficient to find that the money transacted through Henderson's account was derived from wire fraud. The wire-fraud statute requires the government to prove (1) a scheme or artifice to defraud that involved a misrepresentation or omission of material fact; (2) use of interstate wire communications in furtherance of that scheme; and (3) intent to deprive a victim of money or property. *United States v. Daniel*, 329 F.3d 480, 485-87 (6th Cir. 2003).

Henderson does not deny the use of wire communications in transferring the money at issue, only the criminal nature of the money. Henderson argues that the evidence presented at trial did not show that Mark Wittenmyer's consulting fee was derived from wire fraud. (Doc. No. 408 at 10). Instead, Henderson claims the evidence showed that the money was the result of a legitimate and partially performed transaction for Freddie Mac bonds. (Doc. Nos. 391 at 4; 402-1 at 7; 408 at 10-12). Henderson argues that the evidence adduced at trial shows that Panchine Group Limited agreed to pay Wittenmyer a consultancy fee as a condition precedent to Creative Global Consulting, LLC transferring the bonds, that the bonds existed and the transfer process had been initiated, that it was not fraudulent for Wittenmyer to demand a consultancy fee, that there was no convergence between Wittenmyer and the ultimate victim Pierre Leneveu, and that no evidence permitted the jury to infer fraud from Wittenmyer's desire to receive a fee from both sides of the bond deal. (Doc.

---

[1] In his original motion for judgment of acquittal, Henderson said he was not moving for acquittal "on the ground that the subject $500,000 was not derived from wire fraud," but that partial performance of the underlying bond deal "further undermines the Government's claim that Henderson knew the money was criminally derived . . . ." (Doc. No. 391 at 5 n. 1). In his subsequent filings, Henderson has abandoned that approach and is now claiming the underlying bond transaction was not fraudulent. I will consider his arguments in their final, evolved form.

No. 402-1 at 8-16). Henderson also argues that it was Kevin Wheeler, not Wittenmyer, who defrauded Pierre Leneveu. (Doc. No. 391 at 6).

The government argues there was sufficient evidence to prove the $500,000 wire transfer was the proceeds of wire fraud. (Doc. No. 407 at 2). The government argues that the bond deal was premised on the existence of bonds, that those bonds never existed, and that there was evidence from which the jury could infer Wittenmyer knew the bonds did not exist when he demanded the consultancy fee. (*Id.*). This evidence includes that Wittenmyer set up the deal, meaning he was in the best position to know whether the bonds existed. (*Id.* at 3). The government also points to Wittenmyer's use of nominees, use of false documents, threats through Ira Brody to put liens on the non-existent bonds if his fee was not paid, concealment of the wire transfer from Brody, his use of a false name, lavish spending, and that he and Henderson were the only two to profit from the bond deal as further evidence from which the jury could infer fraud. (*Id.* at 4-7). The government further argues there is no convergence requirement in the federal fraud statutes. (*Id.* at 10).

As for Henderson's knowledge that the $500,000 wire transfer was the proceeds of criminal activity, the government argues there was sufficient evidence for the jury to conclude that "Henderson was either well aware of the fraudulent nature of the deal, or he kept himself willfully ignorant of it." (Doc. No. 399 at 1-5).

During the government's case-in-chief, the jury heard from several testifying witnesses and was shown numerous documents. First, Special Agent Eric Robinson of the FBI testified that he was the lead investigator and case agent for the investigation of Wittenmyer. SA Robinson began investigating Wittenmyer in 2010, because the FBI suspected Wittenmyer of engaging in fraudulent trading of security bonds, embezzlement, and wire fraud.

In late 2011 or early 2012, the FBI learned of victims who had sent Wittenmyer money through a business named R M Capital. Subsequent execution of a search warrant revealed that

Wittenmyer was attempting to buy a home that was priced over $1,000,000. SA Robinson was concerned about the source of the money for that purchase, because Wittenmyer had been unemployed for approximately seven or eight years. SA Robinson testified that Wittenmyer's income during that time consisted solely of money stolen from others.

The execution of a second search warrant revealed that Henderson was the realtor working on Wittenmyer's real estate deal. So SA Robinson reached out to Henderson and said he would like to speak with him about Wittenmyer. Henderson was working as an independent contractor with RE/MAX Preferred Associates at the time. RE/MAX's attorneys called SA Robinson and set up a meeting.

Kathy Kuyoth, a real estate broker and RE/MAX co-owner, testified that concerns had already arisen concerning Wittenmyer's real estate transaction. She said a bonus of $50,000 had been promised to the buyer's agent in addition to any commission he would receive for the sale, which was unusual. She also testified that the earnest money for the home was never sent into the trust account and the reported source of the anticipated earnest money kept changing. This caused concern with the title company, prompting the title company to contact RE/MAX about it.

On April 17, 2012, SA Robinson met with Henderson, Kuyoth, RE/MAX's attorneys, and other investigators. In that meeting, Henderson provided details concerning the real estate transaction. Wittenmyer was attempting to purchase a house listed at $1,700,000. Wittenmyer had told Henderson that the money for the house would come from R M Capital. As noted above, SA Robinson was familiar with R M Capital, which he deemed a shell company through which Wittenmyer had recently received approximately $85,000 in ill-gotten funds.

SA Robinson then explained to the group that he was investigating Wittenmyer and that Wittenmyer had long been involved in the theft of funds. SA Robinson also explained that R M Capital's principals had criminal histories involving fraud and that the organization did not have

$2,000,000 to pay for a house. The only funds that passed through R M Capital, according to SA Robinson, were stolen funds.

RE/MAX's representatives at the meeting thus decided at that time to cut ties with Wittenmyer and step away from the pending real estate transaction. They expressed their concerns about the fraudulent nature of the deal and told Henderson he could only continue to engage with Wittenmyer on the real estate transaction if he did it independently of RE/MAX.

Henderson continued to work with Wittenmyer. When RE/MAX became aware of this, the company sent Henderson's license back to the Ohio division of real estate.

On December 22, 2012, SA Robinson went with a local sheriff's deputy to Henderson's home, where Wittenmyer had been staying, to assist in arresting Wittenmyer on charges of credit card fraud. Following Wittenmyer's arrest, Henderson posted a $2,000 cash bond on Wittenmyer's behalf. Wittenmyer's credit card fraud charge later became part of his federal indictment, while the state charge was no-billed by the grand jury. SA Robinson testified that Wittenmyer ultimately pled guilty to his federal charges.

In 2013, Wittenmyer started a new venture – a bond deal. Jeffrey Lasman testified that Wittenmyer asked him to become involved in a Freddie Mac bond deal and serve as the closing attorney for the transaction. Lasman, Brody, and Mohammad Tariq Azmat all testified that the deal was structured such that Azmat was to purchase three Freddie Mac bonds through his company Creative Global Consulting, LLC. Then Creative Global Consulting would transfer or sell those bonds to a limited liability company, which Lasman created. Then the LLC, including the bonds, would be sold to another buyer, who would then sell the bonds. That buyer was to be Panchine Group Limited.

Lasman testified that Wittenmyer was the facilitator of the deal – "the hub of the transaction" – because he was coordinating the parties. Lasman, who was a practicing attorney at

the time, had the role of creating and representing the housing LLC for the bonds and coordinating the legal documents to complete the bond transaction. Brody testified that Wittenmyer asked him to help with documentation for the bond transaction.

Lasman set up CL Trust Management, LLC to be the housing entity for the bonds and provided that to Creative Global Consulting. Lasman testified that Azmat owned CL Trust Management by September 5, 2013, and that Lasman's firm remained the registered agent for the LLC.

When Lasman began working with Wittenmyer on the bond deal, it was his understanding, from Wittenmyer, that Azmat already owned the bonds. Lasman testified that Wittenmyer and Azmat informed him the bonds were owned by Creative Global Consulting and that the bonds were subsequently transferred to CL Trust Management. Wittenmyer and Azmat verified this by emailing Lasman a document that purported to be a financial statement from Morgan Stanley.

Azmat testified that he remembers signing an agreement for the purchase of bonds involving his company Creative Global Consulting. But he says that he contacted Dalyne Shinneman at Ridgeway and Conger, and she explained that bonds could not be bought and sold in the way Wittenmyer had set up the transaction. Azmat testified that he did not know too much about the bond deal but that it appeared incorrect to him and he wanted out of it. Azmat testified that many of the documents shown to him at trial that bear his signature were forged. Azmat also testified that there were no bonds.

After the bonds were allegedly sold to CL Trust Management, Wittenmyer was to receive a $1,000,000 consulting fee. The fee represented one percent of the face value of the bond deal and was to be paid to Henderson through his FTL Properties account. Brody testified that Wittenmyer told him he needed FTL Properties, which was owned by Henderson, to receive the consulting fee,

because Wittenmyer had put the deal together, meaning he could not receive commissions on both sides of the transaction. Wittenmyer also told Brody that all parties were aware of this situation.

But it was difficult for Wittenmyer to collect the commission or consultancy fee, because the involved parties lacked the resources to pay it. So Wittenmyer had Brody write letters on his behalf to obtain the fee in September 2013. (*See* Gov't Exhs. 102 & 103). Lasman also wrote letters urging that the consulting fee be paid. (Gov't Exhs. 110 & 113).

Wittenmyer also suggested liens be placed on the bonds so the bonds could not be sold until his fee was paid to Henderson. Though liens were never placed on any bonds, the other parties to the bond transaction were told they were. (Gov't Exhs. 102, 110 & 113). Brody testified that Wittenmyer and Henderson eventually agreed to accept half of the $1,000,000 fee, which was to be paid to FTL Properties through Brody's office. (Gov't Exh. 103). Lasman testified that in order for the bond deal to work, someone had to put $500,000 into the FTL Properties account.

Meanwhile, Brody had been speaking with SA Robinson, who told him Wittenmyer was involved in illegitimate activities. SA Robinson warned Brody that Wittenmyer might defraud him. Brody continued to work with Wittenmyer, he testified, because Wittenmyer had not been indicted or convicted. And Brody was not sure he had all the facts at that time. Brody also wanted to be paid back for money he had previously loaned Wittenmyer. But having been given this information, Brody informed Henderson that when he received the $500,000 fee, he would process it but that he would also inform SA Robinson that the funds had come in.

Pierre Leneveu eventually wired $500,000 directly to FTL Properties. Leneveu testified about his payment of the $500,000 consultancy fee. Leneveu had an existing relationship with Wheeler, and Leneveu contacted him in November 2013, because he had money he wanted to invest. Leneveu understood Wheeler to be purchasing bonds and then reselling them, generating a profit on the transaction. So Wheeler requested that Leneveu wire $500,000 to FTL Properties.

Leneveu was told to wire the money to FTL Properties and that within seven to ten business days he would get that money back. Then the following week he would get another $500,000 in profit. He never received any money.

Leneveu testified that he did not know the details of the bond deal, only what Wheeler communicated to him. Wheeler explained that the bonds were encumbered by liens, so those liens needed to be removed in order for the bonds to be sold. Leneveu also had no idea what FTL Properties was. He only knew that is where Wheeler instructed him to send the money.

Brody learned in late November or early December 2013 that Henderson had received the $500,000 directly, when it was supposed to be processed through Brody, and that the money was almost all spent.

Lasman testified that the bond deal came under duress after the $500,000 was paid. Wittenmyer was supposed to coordinate a closing of the bond deal in Florida. Lasman called Morgan Stanley prior to the closing to verify the bonds existed, but he did not make contact with anyone there. Lasman then went to take part in the closing, but the closing never occurred. Shortly thereafter, Lasman and Wheeler could not get in contact with Wittenmyer. Lasman testified it was then that he knew there was a problem.

When the closing did not occur, Lasman contacted Azmat, who said the bonds were transferred to the brokerage Ridgeway and Conger. Lasman called Ridgeway and Conger and spoke with someone who confirmed the bonds were received from Morgan Stanley and that Ridgeway and Conger was housing them. Lasman again reached out to Morgan Stanley, this time speaking with someone there who told him there were no bonds.

Lasman testified that he felt duped by Wittenmyer. Lasman was only to be paid when the bond transaction closed with Panchine Group purchasing the bonds. As this never happened,

Lasman received no money from the bond deal. Lasman also came to realize that he did not know Wittenmyer's real name during the bond deal.

Dalyne Shinneman testified that she worked at Ridgeway and Conger in 2013. She was contacted in 2013 by Azmat, who was interested in purchasing mortgage back securities. Shinneman says she identified possible securities that he could buy and that she spoke with him dozens of times over a span of months. But Azmat never opened an account at Ridgeway and Conger, never funded an account there, and he never purchased any bonds through the company.

When shown what was purported to be a memo prepared by her stating that she was ready to execute transactions on three particular bonds, Shinneman denied ever writing the memo. Shinneman did recognize the CUSIP for one of the bonds listed on this memo. She sold that bond to Morgan Stanley, but she did so long after she had been in contact with Azmat. The sale of the bond was the result of an arbitration between Ridgeway and Conger and Morgan Stanley. Shinneman had no knowledge of Azmat being involved in a subsequent sale of that bond.

Shinneman was also shown what purported to be a Ridgeway and Conger account statement for an account belonging to CL Trust Management, but Shinneman testified that Ridgeway and Conger never opened an account for CL Trust Management.

Gary Shumate also testified. He worked as a financial advisor for Morgan Stanley in 2013. He was contacted by someone about opening an account for CL Trust Management, and he testified that the account was in the process of being opened. But it was never fully opened. It was also never funded. Shumate was forwarded a letter that appeared to have been written to Azmat by Lasman, claiming there was $27,000,000 in a bank account available for the bond transaction. (Gov't Exh. 111). Shumate said this letter was forwarded to him to make him aware of the money and that he understood the money was to be wired to Morgan Stanley to pay for the bonds. But the

money never came through.  Shumate tried to contact Lasman about the letter but was unable to make contact.  Lasman denies writing the letter.

Shumate testified that a transaction for the purchase of bonds has to be initiated from the buyer's side through the buyer's broker.  So Morgan Stanley, if it had worked on behalf of a buyer purchasing bonds, would have had to submit a bond order.  Shumate testified that Morgan Stanley never submitted a bond order.  And Shumate never told Azmat or anyone associated with CL Trust Management that Morgan Stanley had Freddie Mac bonds in an account for Azmat.

Finally, Shumate testified that the document appearing to be an account statement prepared by him regarding the three bonds was not an authentic Morgan Stanley account statement.  (Def. Exh. 360).  Shumate testified that it instead looked like a bond proposal that would be provided to show someone bond options.  Shumate testified that there was never a bond purchase that went through.

Brody also testified that he was not aware of anyone ever having the bonds.

Meanwhile, at some point in 2013, SA Robinson learned from other sources that Mr. Henderson had wired money belonging to Wittenmyer from his account.  Concerned that the money was likely stolen, SA Robinson contacted Henderson on November 20, 2013, to ask about the money.  SA Robinson told Henderson he had heard wires were coming from his account.  He asked Henderson if he knew of money passing through any of his bank accounts that may belong to Wittenmyer.  Henderson said he did not know anything about that but that he had loaned Wittenmyer money to help him out.

The FBI subpoenaed Henderson's bank records and received records for a PNC bank account, account number ending in 4617.  The account belonged to Henderson and served as the business bank account for his company FTL Properties Limited, the company Henderson formed to engage in "acquiring, leasing and managing real estate properties . . . ."  (Gov't Exhs. 100 & 106 at

2).  Wittenmyer was not on the account, nor was he an authorized user.  (Gov't Exh. 100).  He was also not included in the articles of organization for FTL Properties.  (Gov't Exh. 106).

The FBI obtained records for Henderson's FTL Properties account spanning six to eight months.  SA Robinson testified that the records for the month of September 2013 reveal income and expenses typical of what was reflected in records for the preceding months in 2013.  In September 2013, Henderson began with an account balance a little over $9,200 and ended with a balance just shy of $6,000.  (Gov't Exh. 163).  His biggest deposit that month was $2,117.75.  (*Id.*).  His largest expense was $955.70 for what appears to be an airplane ticket.  (*Id.*).  And Henderson made no transfers between this account and his other accounts.  (*Id.*).

Betty Padgett, who worked as a bookkeeper for Henderson from January 2012 to May 2013, also testified to Henderson's normal spending habits with respect to his FTL Properties account.  She testified that his spending habits as reflected in his bank statements for April and May 2013 were typical.  During those months, Henderson's balance fluctuated from $36.42 up to $5,858.31 and then down to -$1,407.44.  (Gov't Exhs. 169 & 170).  Also during those months, Henderson had no "check card" purchases over $1,000.  (*Id.*).

But that changed in October 2013.  Henderson's income increased significantly.  (Gov't Exh. 173).  Jeffrey Lasman wired $30,000 to Henderson's account on October 30, 2013.  (*Id.*; Gov't Exh. 119).  Another wire for $9,980 posted to Henderson's account on October 31, 2013.  (Gov't Exh. 173).  SA Robinson testified that purchases accompanied the incoming wires.  For example, on October 31, 2013, Henderson withdrew $5,000 and sent two wires for $10,000 each.  (*Id.*).

SA Robinson testified that Henderson's November records reflected this new trend of higher income and higher-value purchases.  On November 8, 2013, he received a wire of $499,980 from Leneveu.  (Gov't Exhs. 140 & 120).

Henderson's bank statement also reflected a number of high-value purchases, including almost $5,400 at Louis Vuitton; more than $6,000 at the Sandpearl Resort in Clearwater, Florida; over $5,000 at Neiman Marcus in Ft. Lauderdale, Florida; and $21,951.15 at The Ritz Carlton in Ft. Lauderdale, Florida. (Gov't Exh. 140). Henderson also transferred large amounts of money to his personal account at PNC, that account ending in 8488. (*Id.*). Henderson made online transfers of $10,000, $23,000, and $50,000 to his personal account. (*Id.*).

SA Robinson testified that the spending continued into December, with Henderson's FTL Properties account starting at a balance of over $131,000 and ending with a little more than $3,000 by the end of the month. (Gov't Exh. 151).

And Ali Moubarak, who was romantically involved with Henderson in 2013, testified about Henderson's spending habits with respect to his personal bank account PNC 8488. Moubarak and Henderson shared this account. (Gov't Exh. 130). Moubarak testified that in the normal course, Henderson would not deposit more than $10,000 into the account at any one time. Moubarak testified that Henderson's financial activity was typical during the months of June through October 2013. (*See id.*). He stated it was normal for $3,000 or $4,000 to come into the account each month and for the same amount to be spent. But the activity in their account changed in November 2013, when deposits into the account grew to $128,567.60 and the expenditures increased to $123,467.07. (*Id.* at 31).

SA Robinson also testified concerning Henderson's tax return for the year 2013. He testified that Henderson did not report the nearly $500,000 deposit on his taxes for that year. (Gov't Exh. 108 at 27-33).

Viewing the evidence in the light most favorable to the government, I find there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the $500,000 wire transfer was the proceeds of wire fraud. *See Jackson*, 443 U.S. at 319. Henderson relies on the

membership unit purchase agreement between Creative Global Consulting and Panchine Group to argue that the $500,000 wire transfer was a legitimate contractual fee independent of the duty to transfer the bonds. (Doc. Nos. 402-1 at 8; 408 at 10-12; *see* Gov't Exh. 116). But the subject of that purchase agreement was the sale of CL Trust Management and the bonds to Panchine Group by Creative Global Consulting; whereas, it was the sale of the bonds to CL Trust Management that was cited as triggering the obligation to pay Wittenmyer's consulting fee to Henderson. (Gov't Exhs. 102, 103, 110, 113 & 114). So that purchase agreement does not legitimize Wittenmyer's actions.

Wittenmyer was identified as the architect of the scheme by which three Freddie Mac bonds would purportedly be purchased by Creative Global Consulting; then be transferred or sold to CL Trust Management; and then be sold, along with CL Trust Management, to Panchine Group, which would then sell the bonds. Testimony establishes that Wittenmyer was the facilitator of this deal, bringing Lasman, Brody, Wheeler, and Henderson in as players in one role or another.

The entire purpose of the bond deal was to buy and then successively sell three bonds, so that each seller could make a profit. But there were no bonds. Azmat, Lasman, Shinneman, Shumate, and Brody all testified that there were no bonds. There were not even accounts fully opened or funded at either Morgan Stanley or Ridgeway and Conger.

But despite no one having purchased the three Freddie Mac bonds in the first place, Wittenmyer told Lasman that Azmat already owned the bonds. Lasman also testified that Wittenmyer and Azmat told him the bonds were owned by Creative Global Consulting and had been transferred to CL Trust Management. According to Lasman, Wittenmyer and Azmat sent him a document that appeared to be a financial statement for an account housing the bonds at Morgan Stanley. But Shumate testified that this form was not an authentic Morgan Stanley account statement.

And despite there being no bonds purchased by CL Trust Management, Wittenmyer, through Brody, demanded a consulting fee be paid to Henderson. When the fee was not immediately paid, Wittenmyer told Brody to claim that liens had been placed on the (non-existent) bonds. It was then reported to the bond deal participants that there were liens on the bonds, which halted any further attempts to buy or sell them until that consulting fee was paid. Leneveu eventually paid that fee, pursuant to a guarantee he would get his money back and get a $500,000 profit, as well. Neither of those occurred. But Wittenmyer and Henderson got paid. They appear to be the only two who received any money out of this bond deal, and they received that money even though the bonds never existed.

And when Leneveu paid the consulting fee, it was supposed to have been paid to Brody, and Brody was to be responsible for disbursing it. But after Brody told Henderson that he would report any incoming funds to the FBI, he was cut out of the process. So when the consulting fee was paid, it was paid directly to Henderson, circumventing Brody entirely. Brody only found out about it after the fact.

Finally, despite Henderson's claims to the contrary, the Sixth Circuit does not require convergence of identity to convict a defendant of wire fraud. *United States v. Frost*, 125 F.3d 346, 360 (6th Cir. 1997).

Based on the foregoing, I find there is sufficient evidence to support a finding that Wittenmyer devised the bond-deal scheme and lied about the existence of the three Freddie Mac bonds, upon which the entire scheme depended, with the intent of defrauding someone out of the $500,000 consulting fee.

I likewise find the government put forth sufficient evidence from which a rational juror could infer Henderson either knew the $500,000 wire transfer was derived from criminal activity or that he was deliberately ignorant. In April 2012, SA Robinson met with Henderson and RE/MAX

representatives about Wittenmyer's illegal activities.  At that time, RE/MAX made the decision not to continue a business relationship with Wittenmyer.  But Henderson continued to work with Wittenmyer.  Henderson got closer to Wittenmyer, eventually letting him stay in his home.  In December 2012, Wittenmyer was arrested at Henderson's home, and Henderson posted his bond.

Following SA Robinson's warning about Wittenmyer and Wittenmyer's arrest on credit card fraud charges, Henderson had reason to be wary of engaging in financial transactions with Wittenmyer.  And yet he did engage in financial transactions with Wittenmyer.  He joined the bond deal as the recipient of a consulting fee, which he received even though the bonds did not exist.  He allowed large wire transfers to be made into his account.  He and Wittenmyer then quickly spent that money, and Henderson transferred large sums from his business account to his personal account.

After Henderson had already received multiple high-dollar wire transfers into his account, including the $500,000 wire transfer, and after he had spent significant portions of those deposits, SA Robinson called him to ask whether Wittenmyer's money was passing through his account. Henderson claimed to know nothing about it, hiding his activities.  And Henderson did not report the $500,000 wire transfer into his account on his taxes for that year.  This leads to the inference that Henderson had something to hide.

This evidence is sufficient for a rational juror to find beyond a reasonable doubt that Henderson either knew the $500,000 was the result of criminal activity or that Henderson was deliberately ignorant.  As such, I deny Henderson's motion for judgment of acquittal.

**Motion for New Trial**

A defendant may also move for a new trial, and "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "Motions for a new trial are not favored and are granted only with great caution." *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976).  "The defendant bears the burden of proving that a new trial should be

granted." *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994). Henderson moves for a new trial on the grounds that the verdicts were against the weight of the evidence, that the government committed two *Brady* violations, and that the government improperly commented on his failure to contact law enforcement.

### Weight of the Evidence

"A motion for a new trial under Rule 33 . . . may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence. Generally, such motions are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007) (quotation marks omitted). "When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

Henderson made the same arguments for a new trial based on the weight of the evidence as he did for judgment of acquittal (Doc. Nos. 402-1 at 7-16; 408 at 10-21), so I will not repeat them here.

For all the reasons I discussed above in my analysis of the sufficiency of the evidence, and now incorporate here, the evidence produced at trial was enough to justify finding beyond a reasonable doubt that the $500,000 wire transfer was the proceeds of wire fraud and that Henderson either knew that money was criminally-derived or that he was deliberately ignorant as to the source of the money. Because the evidence supports such findings, it cannot be said that it "preponderates heavily against the verdict." *See Hughes*, 505 F.3d at 592-93. I therefore find the jury's verdict was not against the weight of the evidence.

### Prosecutorial Misconduct

A new trial may also be granted where substantial legal error has occurred. *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Here, Henderson claims the government violated his due process rights by withholding *Brady* evidence and violated his right against self-incrimination by commenting on his decision not to voluntarily contact law enforcement.

### *Brady* Violations

Henderson argues the government twice violated his due process rights by withholding *Brady* evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963). First, Henderson claims the government failed to disclose Brody's status as an informant or agent of the government. (Doc. No. 402-1 at 16, 19-26).[2] Second, Henderson argues the government failed to disclose impeachment material relative to Brody. (Doc. No. 408 at 23 n. 6).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The *Brady* rule applies to both exculpatory evidence and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985). "Under contemporary doctrine, there is a *Brady* violation, and a new trial is warranted, if three conditions are met: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, *either willfully or inadvertently*; and prejudice must have ensued." *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)) (internal quotation marks omitted) (emphasis in original).

---

[2] Henderson originally also argued that Brody committed perjury, and the government failed to correct it, when Brody testified to being retired from the practice of law. (Doc. No. 402-1 at 17-18). Henderson based this argument on Brody's registration with the New York State Unified Court System. (*Id.*; *see* Doc. No. 402-2). After the government responded, explaining that attorneys in New York must register whether active or retired (Doc. No. 407 at 12-13), Henderson conceded this argument (Doc. No. 408 at 23 n. 1).

Turning first to Henderson's argument that Brody was an undisclosed government agent or informant, I find this claim meritless. Henderson relies on Brody's testimony at trial that he met with the FBI "many, many times . . . way more than four" and "[m]ore than ten" as evidence that Brody served as an informant for the government. (Doc. Nos 402-1 at 19-20; 408 at 21).

Henderson also cites to an FD-302 form, in which SA Robinson reported that Brody had informed Wittenmyer that the FBI had contacted him "at the allowance of [SA Robinson]." (*See* Doc. No. 407-1 at 4). Henderson cites this as evidence that Brody was "taking directions from the FBI" and was thus an agent of the government. (Doc. No. 408 at 22). Henderson therefore claims he was prejudiced by this failure to disclose, because he was prevented from raising the defenses of entrapment and entrapment by estoppel. (Doc. Nos. 402-1 at 20-26; 408 at 21-28).

The government denies committing a *Brady* violation, arguing Brody was not a government agent. The government argues Brody was never employed by the government, "never identified as a formal source, . . . never given admonishments about being a source for the FBI, . . . never paid, . . . and never offered to be paid." (Doc. No. 407 at 15). According to the government, Brody was simply a witness who happened to give information to the FBI "on more occasions than other witnesses . . . ." (*Id.* at 15-16). And these occasions, the government claims, were documented and disclosed to Henderson long before trial. (*Id.*). Regardless, argues the government, even if Brody was a government agent and the government had failed to disclose such, Henderson is unable to demonstrate he had viable entrapment or entrapment-by-estoppel defenses based on that undisclosed information. (Doc. No. 407 at 17-22).

Henderson makes much of what he sees as a major discrepancy between Brody's testimony concerning his contacts with the FBI and those contacts as documented by the FBI and disclosed by the government. When asked if he had met with the FBI four times, Brody responded that he had spoken to the FBI "way more than four" times. When asked if he remembered how many times,

Brody said he spoke with the FBI many times but that he was unable to say how many. Defense counsel then asked if it was fewer or greater than ten times. Brody said it was more than ten. Defense counsel then asked if it was more than twenty, but Brody was not prepared to say it was that many.

But the discrepancy between Brody's recollection of his contacts with the FBI and his contacts memorialized on the 302s is not so great. By my reading of the 302s, there were ten instances of contact between Brody and the FBI. SA Robinson first spoke with Brody over the phone on September 7, 2012. (Doc. No. 407-1 at 2). SA Robinson again spoke with Brody by phone on December 4, 2012 and December 6, 2012. (*Id.* at 4-5). In addition to the December phone conversations, Brody provided the FBI with text and Skype correspondences between himself and Wittenmyer, presumably necessitating another instance of contact. (*Id.* at 5). Brody spoke with the FBI by phone again on January 30, 2014; an unspecified date in February, presumably in 2014; and February 28, 2014. (*Id.* at 6 & 7). On March 20, 2014, Brody emailed SA Robinson and then called him to follow up with more details. (*Id.* at 9). And on June 25, 2014, Brody spoke with SA Robinson over the phone. (*Id.* at 10). So Brody's recollection that he spoke to the FBI more than ten times is quite close to the contacts recorded by the FBI and disclosed to Henderson, possibly differing by only one.

And this discrepancy may simply be the result of the passage of time between Brody's contacts with the FBI and Henderson's trial. Brody's contacts with the FBI occurred between September 7, 2012 and June 25, 2014. (*Id.* at 2-10). So Brody first spoke with the FBI nearly six years before Henderson's trial, and he last spoke with the FBI nearly four years prior to Henderson's trial. And when initially asked how many times he had spoken with the FBI, Brody said he was unable to give a number. It was only after defense prodding that Brody said he spoke with the FBI more than ten times.

Henderson also points to the 302 dated December 6, 2012, as further evidence that Brody acted as an agent for the government. In that 302, SA Robinson wrote that Brody informed Wittenmyer he had been contacted by the FBI "at the allowance of [SA Robinson]." (Doc. No. 407-1 at 4). Henderson takes this to mean Brody was "taking directions from the FBI." (Doc. No. 408 at 22).

But allowing someone to do something is not the same as directing someone to do something. To direct someone is to "[g]ive (someone) an official order or authoritative instruction." Oxford English Dictionary (2018). But to allow is to "[l]et (someone) have or do something." *Id.* And SA Robinson noted that he allowed Brody to reveal his contact with the FBI to Wittenmyer, not that he directed him to do so. (Doc. No. 407-1 at 4).

Henderson has failed to show that Brody was anything more than a witness who provided information to the FBI on several occasions. There is no indication that Brody served as an informant or acted at the direction of the FBI. Brody's contacts with the FBI were memorialized in several 302s and disclosed to Henderson more than two years prior to trial. (Doc. No. 407-1). As such, I find no evidence was suppressed and there is no *Brady* violation.

Turning next to Henderson's claim that the government suppressed impeachment evidence relating to Brody, I similarly find that claim to be without merit. Henderson points to pending civil litigation in which Brody was "implicated along with his business partners and others in a fraudulent scheme that caused losses" exceeding $100 million and the government's failure to disclose it. (Doc. No. 408 at n.6) (citing *Fifth Third Bancorp, et al. v. Certain Underwriters at Lloyd's, et al.*, 14-cv-869 (S.D. Ohio)). The government had no opportunity to address this claim, as Henderson introduced it for the first time in his reply brief.

Henderson's claim fails because *Brady* "does not apply to information that is not wholly within the control of the prosecution." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Indeed, "there

is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

The original complaint in the case cited by Henderson was filed November 10, 2014. *Fifth Third Bancorp*, at Doc. No. 1. The amended complaint to which Henderson cites was filed March 28, 2017. *Id.* at Doc. No. 113. The case settled in June 2017. *Id.* at Doc. No. 138. Henderson's trial did not begin until February 16, 2018. The evidence of the pending civil litigation was a matter of public record and thus available to Henderson from another source well before trial. Indeed, Henderson eventually found it from another source. As such, I find no *Brady* violation.

### Commenting on Henderson's Failure to Contact the FBI

Henderson next claims the government improperly commented, directly and indirectly, on his pre-arrest silence during closing arguments and that he should be granted a new trial. (Doc. Nos. 402-1 at 27; 408 at 8-10). In its closing argument, counsel for the government stated

> But what did Ira Brody say about his knowledge of Mark Wittenmyer? He got warned, too. He said well Mark Wittenmyer wasn't indicted wasn't convicted at the time but he change[d] the way he treated Mark Wittenmyer. He said [if] I'm going to get money, I'm going to call the FBI first. Not Ray Henderson.

Henderson argues that in saying this, the government used his "election not to self-report to the FBI" to infer his guilt in violation of the Fifth Amendment as interpreted by the Sixth Circuit. (Doc. No. 408 at 7-10). Henderson did not object to the government's closing argument during trial.

The government contends that it did not comment on Henderson's silence in any context, including his decision not to contact the FBI. (Doc. No. 407 at 22-24). But had it commented on that decision, argues the government, its comments would have been proper. (*Id.* at 24-26). Finally, the government argues that even had it improperly commented on Henderson's silence, its remarks were not flagrant. (*Id.* at 26-28).

The Sixth Circuit employs a two-step test in analyzing claims of prosecutorial misconduct. *United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir. 2013). First, I must determine whether the prosecutor's comments were improper. *Id.* Courts give prosecutors "wide latitude . . . during closing argument, analyzing the disputed comments in the context of the trial as a whole . . . ." *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011). And "[i]nappropriate prosecutorial comments, standing alone, do not warrant a new trial. To warrant relief, the prosecutorial misconduct must have been so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008) (internal quotation marks and citation omitted). So if the comments were improper, I must then determine whether "they were so flagrant as to warrant" a new trial. *Lawrence*, 735 F.3d at 431.

I find the government's comment during closing argument was not improper. First, the government did not directly reference Henderson's decision not to contact the FBI as substantive evidence of his guilt. Henderson claims the government directly referenced his "election not to self-report to the FBI" when the government argued "[Brody] said [if] I'm going to get money, I'm going to call the FBI first. Not Ray Henderson." (Doc. No. 408 at 9). But even ignoring the context provided by the government's closing argument as a whole, the comment did not specifically state that Henderson did not contact the FBI and should thus be found guilty. *See Wells*, 623 F.3d at 338 (finding no direct reference to Defendant's decision not to testify when prosecutor did not specifically state that Defendant did not testify and did not offer an alternative explanation). Standing alone, the statement comes close but ultimately falls short of directly referencing Henderson's silence.

And when read within the context of the government's closing argument as a whole, the statement is even further from a direct reference to Henderson's decision not to contact the FBI. In this portion of its closing, the government made its case for how Henderson's words and actions

evidenced his knowledge and intent.  The government referenced the jury instructions on inferring Henderson's mental state and on deliberate ignorance before moving into specific evidence presented at trial.

The government first pointed to Henderson's sister, Christina Perry, who had testified on Henderson's behalf.  The government offered her as a comparison to Henderson, citing her testimony as "a textbook example of what deliberate ignorance is."[3]

The government then drew a comparison between Henderson and RE/MAX's management, highlighting the difference between Henderson's and the company's reactions after SA Robinson met with them to explain the FBI's investigation of Wittenmyer.  The government stated that, after that meeting, RE/MAX cut ties with Wittenmyer but that Henderson let Wittenmyer move in with him.  The government also pointed out that local law enforcement had arrested Wittenmyer at Henderson's house.

Finally, the government came to its comparison between Brody and Henderson.  After having been warned about Wittenmyer by the FBI, the government argued, Brody "change[d] the way he treated Mark Wittenmyer.  He said [if] I'm going to get money, I'm going to call the FBI first.  Not Ray Henderson."  So the comparison between Brody's and Henderson's reactions was the final in a series of comparisons meant to highlight Henderson's actions as a means of establishing his mental state.  Though the government pointed to Brody's decision to call the FBI if he was going to get money from any deals with Wittenmyer, the point, which the government made immediately before that statement, was that Brody changed the way he treated Wittenmyer upon being warned of

---

[3] Ms. Perry was Wittenmyer's then fiancée and seemingly oblivious to the source of Wittenmyer's funds used to provide her with luxuriant travel and lavish gifts, such as, by her own testimony, "diamonds and pearls, baby."  She testified that when $20,000 was deposited into her account, she did not bother asking who put it there or try to return it.  She just assumed Wittenmyer had put it in her account, and she spent it.

the FBI's investigation and Wittenmyer's possible criminal activity. Henderson did not. Therefore, the government did not directly comment on Henderson's silence.

Neither did the government indirectly comment on Henderson's silence. In evaluating claims of improper indirect comments on a defendant's silence, I am to consider "(1) whether the comments were manifestly intended to reflect on the accused's silence or are of such a character that the jury would 'naturally and necessarily' construe them as such; (2) whether the comments were isolated or extensive; (3) whether there was otherwise overwhelming evidence of guilt; and (4) whether appropriate curative instructions were given." *United States v. Wells*, 623 F.3d 332, 338 (6th Cir. 2010).

Henderson's argument fails on the first prong. I may not find that the government manifestly intended to comment on Henderson's silence "if some other explanation for [its] remark is equally plausible." *Id.* at 339. And "[w]hether the jury 'necessarily construes' a prosecutor's remark as a comment on a defendant's failure to testify requires a probing analysis of the context of the comment, and the likely effect of the district court's curative instruction, if any." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981).

Viewed in context, as more fully discussed above, the government's challenged statement, though inartfully worded, was neither manifestly intended to comment on Henderson's decision not to contact the FBI nor of such a character that the jury would "naturally and *necessarily*" construe it as such. Henderson focuses only on the government's comparison between himself and Brody, but the government set up a succession of comparisons explicitly meant to highlight Henderson's actions as evidence of his mental state. The government juxtaposed Henderson's actions with examples of what a person might do after finding out there might be a criminal in that person's orbit.

To that end, the government's argument was not in conflict with the instructions I gave the jury on the subject of inferring Henderson's state of mind. I instructed the jury, in part, that "a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence to show what was in the defendant's mind." (Doc. Nos. 394 at 23; 395 at 18). Against the background of that instruction and in light of the government's broader line of argument, I find the government's challenged statement is not properly interpreted as an indirect comment on Henderson's silence.

Even assuming the government had commented on Henderson's failure to contact the FBI, it would not have been improper to do so. "[P]rosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt if the defendant did not expressly invoke his right to remain silent." *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014) (citing *Salinas v. Texas*, 570 U.S. 178, 191 (2013)). As such, I deny Henderson's motion for a new trial with respect to his claim for prosecutorial misconduct.

## CONCLUSION

Accordingly, I deny Henderson's motion for judgment of acquittal and his renewed motion for judgment of acquittal or, in the alternative, a new trial. (Doc. Nos. 391 & 402).

A telephone conference is scheduled for September 27, 2018 at 10:30 a.m. Counsel shall call the bridge line at 877-411-9748, access code 1231873.


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge