UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                        Case No. 3:14-cr-89

             Plaintiff,

      v.                                                              MEMORANDUM OPINION
                                          AND ORDER

Arvel Ray Henderson, II,

             Defendant.


## I.  INTRODUCTION

*Pro se* petitioner Arvel Ray Henderson, II has filed a motion, under 28 U.S.C. § 2255, to

vacate the sentence imposed in Case Number 3:14-cr-89 following his conviction by a jury on five

counts of money laundering-related offenses.  (Doc. No. 489).  The government filed a brief in

opposition.  (Doc. No. 492).  Henderson filed a brief in reply.  (Doc. No. 494).  Henderson

subsequently filed a motion requesting a status update on his 2255 petition.  (Doc. No. 495).  For

the reasons that follow, I deny Henderson's motions.

## II.  BACKGROUND

The Sixth Circuit described the underlying facts in this case as follows:

Arvel Henderson, II played a key role in a scheme to sell bonds that no one in the
deal ever had authority to sell.  That scheme was crafted by Mark Wittenmyer, an
accomplished fraudster whom the FBI had been investigating for years. . . . .

Henderson first met Wittenmyer in late 2011 when Wittenmyer was planning on
purchasing a home in Sylvania, Ohio for $1.7 million.  Henderson was a real estate
agent working for RE/Max in Toledo, Ohio at the time.  The FBI had been

investigating Wittenmyer for various financial crimes since 2008, and this potential real estate transaction drew the FBI's attention because Wittenmyer had not earned any legitimate income for the past seven or eight years and was using money he obtained illegally during that time.

Wondering just how Wittenmyer could afford an expensive home, FBI agent Eric Robinson met with Henderson and several other RE/Max representatives on April 17, 2012 regarding the proposed sale. Henderson told Robinson that the $1.7 million was coming from a group called RM Capital, which Robinson knew was a shell company that Wittenmyer had recently used to illegally obtain $85,000. Robinson explained this information to Henderson and the RE/Max representatives and confirmed that Wittenmyer and other individuals from RM Capital were using stolen money. Afterwards, the RE/Max representatives told Robinson they did not want to be involved with the deal and had concerns about its fraudulent nature. Henderson had a different idea. Henderson was upset that he might lose out on a "premium commission" of almost $100,000 if the deal did not go through, even though Robinson explained the FBI would seek to forfeit any money that came from RM Capital. Undeterred, Henderson decided to continue with the sale, and so RE/Max returned Henderson's real estate license to the Ohio Division of Real Estate.

On December 22, 2012, Wittenmyer was arrested at Henderson's home and charged with fraud in an unrelated transaction, which was later incorporated into the federal indictment in this case. Henderson posted Wittenmyer's bond and told the bail bondsman he expected to make a substantial amount of money on the sale of a house to Wittenmyer. Unfortunately for Henderson, Wittenmyer never bought the house.

But Henderson was still seeking that premium commission. In 2013, Wittenmyer facilitated an agreement where a company called Creative Global Consulting would purchase three Freddie Mac bonds and then sell them to a shell company, CL Trust Management, which would then sell the bonds to another buyer, the Panchine Group. Wittenmyer told the Panchine Group that Creative Global Consulting already owned the bonds. The bonds had a face value of $100 million, and so Wittenmyer's commission would be one percent (or $1 million). While Creative Global Consulting had multiple conversations with a bond broker, the company never opened an account or attempted to purchase any bonds. Henderson was necessary to this scheme according to Wittenmyer because he told Henderson he couldn't have the commission paid directly into his account as he brokered the deal, and so the plan was for the commission to be deposited into Henderson's FTL Properties business account.

Wanting a third associate, Wittenmyer reached out to Ira Brody to assist him with the bond deal. Wittenmyer knew Brody because Wittenmyer asked Brody for a seven-day loan to close a financial deal in 2012. Brody loaned him the money, but Wittenmyer had not paid Brody back by the time of the bond deal. So, Brody agreed to participate in the bond deal because he was still hoping to get back what he loaned Wittenmyer. Because no one was willing to pay the million-dollar commission for the bond deal, Brody wrote threatening letters to the involved parties claiming that liens would be placed on the bonds if the commission was not paid (rendering them unsellable). The owner of CL Trust Management eventually grew skeptical and withdrew from the deal.

Recognizing that one million dollars was not coming, Wittenmyer and Henderson decided half was better than none and agreed to accept $500,000 instead. Brody told Wittenmyer and Henderson that he was willing to process the $500,000 commission through his business but would tell Robinson about the transaction. Unsurprisingly, Wittenmyer and Henderson didn't like that idea, and accepted the $500,000 commission into Henderson's FTL Properties account on November 8, 2013 directly from P.L., a different buyer who had been contacted by the Panchine Group. A representative from the Panchine Group promised P.L. that he would get his $500,000 back within a week or two and then another $500,000 shortly thereafter, but he never received any money.

After getting the commission that he wanted, Henderson began spending the $500,000 as rapidly as he could. No better place to do that than South Florida; Henderson spent thousands at Louis Vuitton, Neiman Marcus, Joe's Stone Crab, the Art of Shaving, Hertz, and various hotels, as well as transferring thousands to his personal account. Henderson and Wittenmyer also took a trip to Las Vegas at the end of November 2013, spending tens of thousands on hotels and gambling. By the time Brody learned about the $500,000 deposit in late November or early December, Henderson told him almost all the money had been spent.

During the midst of Henderson's spending spree, Robinson learned about the $500,000 wire transfer and contacted Henderson about it on November 20, 2013. Henderson said he didn't know anything about the wire transfer and had simply loaned Wittenmyer some money. The FBI's subpoena of Henderson's bank records for FTL Properties told a different story, revealing the $500,000 wire transfer as well as showing a stark difference between Henderson's normal spending habits and his spending when the closing for the bond deal began.

On June 3, 2015, in the United States District Court for the Northern District of Ohio, Henderson was charged with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and five counts of engaging in monetary transactions with property derived from a specified unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2. The government dismissed one of the counts before trial. Additionally, Henderson was charged with bankruptcy fraud based partially on his failure to declare the $500,000 commission on his list of assets. *See United States v. Henderson*, 3:16-CR-285 (N.D. Ohio 2016).

The government, over Henderson's opposition, sought to consolidate the two cases, given that they involved the same defendant, the same bank accounts, and the same business entity. The district court denied the motion, finding that the overlap between the money laundering charges and bankruptcy fraud was minimal and the potential for prejudice was too great. The trial on the money laundering charges began on February 20, 2018, and on February 23, 2018, Henderson was found guilty on all five counts.

On January 10, 2019, one day before his sentencing, Henderson filed a motion to continue, claiming a Brady violation because the government failed to produce relevant discovery in the bankruptcy fraud case involving anonymous complaints and emails to the bankruptcy trustees, and arguing that the discovery would have changed his trial strategy in this case. These emails allegedly revealed that the bankruptcy trustee treated Henderson's bankruptcy petition as a criminal referral and that the United States Trustee's Office may have thought Henderson's bankruptcy counsel was involved in the suspected fraud. The district court proceeded with the sentencing hearing the following day and addressed the motion to continue, denying Henderson's motion.

*United States v. Henderson*, 824 F. App'x 325, 326-29 (6th Cir. 2020).

The Sixth Circuit rejected Henderson's arguments on appeal. Most relevant here, it addressed his contention that his motion to continue his sentencing should have been granted in light of "potential *Brady* material produced in his bankruptcy fraud case." *Henderson*, 824 F. App'x at 329. That material consisted of "a set of communications and emails between the United States Trustee's Office, Henderson's civil attorneys, and an anonymous complainant. The emails suggest that the United States Trustee's Office was treating Henderson's bankruptcy petition as a criminal

4

referral and that Henderson's bankruptcy counsel might also be implicated in the suspected misconduct." *Id.*

The court concluded Henderson failed to "show any potential *Brady* violation that occurred should have impacted the district court's decision on whether to continue his sentencing." *Id.* "The purported *Brady* evidence was related only to Henderson's bankruptcy trial, and its disclosure had no impact on the sentencing for Henderson's money laundering convictions." *Id.* Because the material was "not relevant to Henderson's money laundering trial . . . there was no reason to delay Henderson's sentencing." *Id.*

Separately, a jury found Henderson guilty in Case No. 3:16-cr-285, his bankruptcy fraud case, of one count of theft of public money under 18 U.S.C. § 641, one count of concealment of bankruptcy assets under 18 U.S.C. § 152(1), and one count of bankruptcy fraud under 18 U.S.C. § 157(2). *See United States v. Henderson*, Case No. 3:16-cr-285, Doc. No. 95 (N.D. Ohio Nov. 19, 2019). The Sixth Circuit also affirmed this conviction on appeal. *United States v. Henderson*, Case No. 20-3017, 2021 WL 3173261 (6th Cir. July 27, 2021).

### III.   STANDARD

Section 2255 permits a criminal defendant to challenge the sentence he received through a claim that the defendant's sentence was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).[1] Defendants challenging their sentence under § 2255 must identify a constitutional error, "a fundamental defect which inherently results in a complete miscarriage of justice," "an omission inconsistent with the rudimentary demands of fair procedure,"

---

[1] Section 2255 requires that the habeas petitioner be "in custody." 28 U.S.C. § 2255(a). Henderson was incarcerated and serving his sentence when he first filed his motion, on November 10, 2021. (*See* Doc. No. 489). He was released on December 28, 2022. (Doc. No. 496). Because Henderson was "in physical custody under the challenged conviction at the time the petition was filed," his petition satisfies the statutory "in custody" requirement. *Maleng v. Cook*, 490 U.S. 488, 492 (1989) (citing *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)).

5

or "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Hill v. United States*, 368 U.S. 424, 428 (1962) (citations and internal quotation marks omitted).

A conviction under attack pursuant to § 2255 is presumed valid. *United States v. Frady*, 456 U.S. 152, 164 (1982). A petitioner seeking to set aside a conviction has the burden of "sustaining [his] contentions by a preponderance of the evidence." *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (quotation omitted). In addition, "[a] § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances." *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (citation and quotation marks omitted).

## IV.    ANALYSIS

Henderson seeks the following relief: "a hearing to determine whether to vacate the judgement of conviction filed against him in this Court for violation of Money Laundering." (Doc. No. 489 at 1). He does not seek, in this proceeding, to vacate the separate sentence imposed in Case No. 3:16-cr-285, his bankruptcy fraud case. *See Charles v. Chandler*, 180 F.3d 753, 755 (6th Cir. 1999) ("courts have uniformly held that claims asserted by federal prisoners that seek to challenge their convictions or imposition of their sentence shall be filed in the sentencing court under 28 U.S.C. § 2255"). I sentenced Henderson in this case, Case Number 3:14-cr-89, on January 11, 2019. (See Non-document entry dated January 11, 2019). United States District Judge Jack Zouhary sentenced Henderson in his bankruptcy fraud case, 3:16-cr-285, nearly a year later, on December 20, 2019.[2] *See United States v. Henderson*, Case No. 3:16-cr-285, non-document entry (N.D. Ohio December 20, 2019).

---

[2] I use "bankruptcy fraud case" to refer to the separate proceedings in Case No. 3:16-cr-285 for the sake of convenience. Henderson was convicted of two offenses related to his bankruptcy petition itself and one offense related to his embezzlement of money from the Section 8 housing program.

But Henderson's § 2255 petition discusses both his money laundering convictions and his subsequent bankruptcy fraud convictions.  Even though Henderson formally seeks relief only from the sentence imposed for his money laundering convictions, he commingles arguments attacking the bankruptcy fraud prosecution with arguments attacking the money laundering prosecution.  In fact, his overarching legal theory is that purported government misconduct related to the bankruptcy fraud prosecutions violated his 5th and 6th Amendment rights in his money laundering case because the looming threat of proceedings in his bankruptcy fraud case effectively denied him his right to testify in his money laundering trial.  (*See* Doc. No. 489 at 21; Doc. No. 494 at 13-14).

The government contends that Henderson's arguments targeting the separate bankruptcy fraud prosecution are procedurally barred and may not be brought in a § 2255 motion asking for relief from the separate sentence imposed, in this case, for the money laundering convictions.  (*See* Doc. No. 492 at 28-32).  Because this dispute over the permissible scope of Henderson's § 2255 petition affects my evaluation of the rest of Henderson's arguments, I address it first.

## A.    PROCEDURALLY-BARRED ARGUMENTS

A petition under 28 U.S.C. § 2255 "must be filed in the district court which sentenced the movant."  *In re Gregory*, 181 F.3d 713, 714 (6th Cir. 1999).  The "district court which sentenced" Henderson in his bankruptcy fraud case was United States District Judge Jack Zouhary, in case number 3:16-cr-285.  *See United States v. Henderson*, Case No. 3:16-cr-285 (N.D. Ohio).  Henderson did not file a § 2255 motion in that case seeking to vacate the sentence Judge Zouhary imposed on December 20, 2019.  *See id.*  Henderson's current motion, which seeks to vacate only the sentence I imposed on January 11, 2019 for his money laundering offenses, may only challenge the basis for that conviction and sentence—he may not collaterally attack his bankruptcy fraud case as well.  (*See* non-document entry dated January 11, 2019).  *See Daniels v. United States*, 532 U.S. 374, 383 (2001) (holding that a § 2255 petitioner generally may not use their motion to collaterally challenge a prior

conviction); *see also Witham v. United States*, 97 F.4th 1027, 1031 (6th Cir. 2024) ("A petitioner is bound by his procedural default in all but the 'extraordinary case'") (quoting *Schlup v. Delo*, 513 U.S. 298, 321 (1995)).

Henderson states: "the government created a crime, intentionally interfering in Petitioner's relationship with his bankruptcy attorneys-aiding them so that the advice-disclosure given to his criminal attorneys by Petitioner's bankruptcy attorneys rendered their criminal attorney's advice so ineffective as to amount to an intrusion of the attorney client relationship concerning the Petitioner[']s use of their counsel not to testify in his money laundering trial." (Doc. No. 489 at 14). The contention that the government "created a crime" appears to refer to Henderson's decision to agree to a waiver of discharge in the bankruptcy proceeding that was ultimately the subject of his bankruptcy fraud prosecution. (*See id.*); *see also* 11 U.S.C. § 727(a)(10) (a bankruptcy court "shall grant the debtor a discharge, unless . . . the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter"). In Henderson's view, he "would have avoided prosecution on the bankruptcy fraud claims[] by simply having his attorneys amend[] his schedules as was his right under Bankruptcy Rule 1009" if he had not agreed to the waiver of discharge. (Doc. No. 489 at 17).

Relatedly, Henderson argues "it was [Matthew] Bryant," one of his civil bankruptcy attorneys, "who forged Henderson's signature and then submitted his bankruptcy schedules to the bankruptcy court without his informed consent." (Doc. No. 494 at 3). This refers to Henderson's discovery, shortly before trial in his bankruptcy fraud case, that Bryant improperly signed a bankruptcy filing that should have been signed by Henderson himself but was not. *See United States v. Henderson*, Case No. 3:16-cr-285, Doc. No. 60 at 1 (N.D. Ohio March 19, 2019). Henderson also asserts that the Office of the United States Trustee "was treating [Petitioner's] bankruptcy petition as a criminal referral"—another reference to alleged malfeasance related to the government's

investigation of his separate bankruptcy fraud offenses.  (Doc. No. 489 at 3) (modifications in original).

These arguments attack the basis for Henderson's conviction and sentencing in his bankruptcy fraud case, a different conviction for which he was separately sentenced by a different United States District Judge.  Accordingly, I cannot consider them here.  As I previously noted, Henderson does raise other arguments specific to his money laundering conviction, and I address those below.  But Henderson is procedurally barred from raising, in this proceeding, arguments challenging his bankruptcy fraud conviction and sentence.

### B.    INEFFECTIVE ASSISTANCE OF COUNSEL

Henderson's arguments directly concerning his money laundering prosecution focus on his decision not to testify in his defense.  He first argues he was denied the effective assistance of counsel, which, he says, resulted in his failure to testify in his defense.  (*See* Doc. No. 489 at 15-17; Doc. No. 494 at 19).

A criminal defendant has the right to "effective assistance of counsel" in their criminal case. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); U.S. Const. amend. VI.  To show he was denied the effective assistance of counsel, Henderson must satisfy a "two prong test:" first, he must show "his counsel provided deficient performance," and second, he must demonstrate that "the deficient performance prejudiced [his] defense."  *Sylvester v. United States*, 868 F.3d 503, 509 (6th Cir. 2017) (internal citations omitted).

Counsel's performance is deficient where their "'representation f[alls] below an objective standard of reasonableness,'" which means the attorney or attorneys "'made errors so serious that [they were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Sylvester*, 868 F.3d at 510 (quoting *Strickland*, 466 U.S. at 687-88).  To show he was prejudiced by his counsel's performance, Henderson "must show by 'a reasonable probability that, but for counsels'

errors, the result of the proceeding would have been different.'" *Sylvester*, 868 F.3d at 511 (quoting *Strickland*, 466 U.S. at 694). Because I conclude Henderson has not met his burden to show his attorneys' performance was deficient, I do not address the "prejudice" prong.

Henderson does not contend his criminal defense attorneys made sloppy errors or represented him incompetently. Instead, he suggests the fact that they did not know about the supposed government malfeasance in Henderson's bankruptcy fraud investigation rendered their assistance defective. *Cf., e.g.*, *United States v. Coleman*, 835 F.3d 606, 611-12 (6th Cir. 2016) (evaluating the defendant's claim he was "constructively denied" the effective assistance of counsel "on the ground that [his lawyer] had insufficient time in which to prepare a defense").[3]

---

[3] In addition to the ineffective assistance of counsel standard from *Strickland*, Henderson also cites *United States v. Cronic*, 466 U.S. 648 (1984). (*See* Doc. No. 492 at 9, 15). Under *Cronic*, "where a petitioner [has] suffered a 'complete denial of counsel,' such a denial is 'so likely to prejudice the accused' that courts presume 'that a trial is unfair if the accused is denied counsel at a critical stage of his trial,'" and the petitioner need not show prejudice—unlike under *Strickland*. *Maslonka v. Hoffner*, 900 F.3d 269, 279 (6th Cir. 2018) (quoting *Cronic*, 466 U.S. at 658-59). *Cronic* claims can include the "'constructive' denial of counsel where 'counsel is placed in circumstances in which competent counsel very likely could not render assistance.'" *Maslonka*, 900 F.3d at 279 (quoting *United States v. Morris*, 470 F.3d 596, 601 (6th Cir. 2006) (additional citation omitted). Henderson's argument does not differentiate between these two types of ineffective-assistance claims.

Regardless, Henderson does not have a viable *Cronic* claim. Henderson does not explain how his money laundering defense attorneys' ignorance of the government's purported misconduct in investigating his bankruptcy fraud constituted "the complete denial of counsel," caused them to "fail[] to subject the prosecution's case to meaningful adversarial testing," or "placed [them] in circumstances in which competent counsel very likely could not render assistance." *Mitchell v. Mason*, 325 F.3d 732, 742 (6th Cir. 2003) (quoting *Bell v. Cone*, 535 U.S. 685, 695-96 (2002)) (further citation omitted). Instead, at most, he argues his attorneys would have given him different advice regarding whether to testify in his money laundering case if they had known this information. (*See* Doc. No. 494 at 15). This assertion is not enough to succeed on a *Cronic* claim because "'counsel's failure in particular instances is evaluated under *Strickland*.'" *Maslonka*, 900 F.3d at 280 (quoting *Mitchell*, 325 F.3 at 744); *cf., e.g.*, *United States v. Hornback*, Case No. 3: 10–13–DCR, 2014 WL 2768872, at *22 (E.D. Ky. June 18, 2014) (adopted report and recommendation) (rejecting a *Cronic* claim where the defendant "had assistance of counsel throughout the case, and he does not allege that [his attorney] failed to meaningfully and appropriately challenge the Government's case"). To the extent Henderson argues his counsel was deficient under *Cronic* rather than under *Strickland*, I reject that argument.

Henderson contends:

> "[T]he US Trustee obtained the Waiver of Discharge in bad faith, assisting Attorney Bryant resulting in conceal[ment] of his fraudulent acts in filing the Schedules presenting the Waiver and Discharge so as to avoid a 2004 hearing which would have disclosed Attorney Bryant forged Petition[er']s signature to the Schedules where he omitted assets, most important of these the $500,000 money laundering proceeds. The Government then claimed a crime was committed by Petitioner, when in fact, although they knew Petitioner intended to amend the Schedules, they acted to deliberately remove his right to do so by intentionally avoiding the bankruptcy court's right to review."

(Doc. No. 489 at 18).

He argues this alleged government conduct related to the investigation of his bankruptcy petition intruded on his relationship with his criminal defense attorneys in his money laundering case. (*See* Doc. No. 489 at 15-17). To support these assertions, Henderson has attached a number of exhibits containing what appear to be email communications, other written correspondence, and court documents. (*See* Doc. Nos. 489-1, 489-2, 489-3, 489-4, 489-5, 489-6, 489-7 489-8, 489-9, 489-10, 489-11, 489-12, 494-1, & 494-2). As I explained above, I may not consider or credit any assertions Henderson makes about supposed deficiencies in his bankruptcy fraud conviction itself. But I will address his argument about his relationship with his criminal defense attorneys in his money laundering case.

Henderson's "intrusion" argument invokes "cases holding that deliberate 'preindictment intrusion[s]' into the attorney-client relationship may prove 'so pervasive and prejudicial' as to imperil the fairness of subsequent proceedings." *Gaetano v. United States*, 942 F.3d 727, 732 (6th Cir. 2019) (quoting *United States v. Voigt*, 89 F.3d 1050, 1066 (3d Cir. 1996)); (*See* Doc. No. 489 at 15) (citing *Voigt*). "Vanishingly few decisions" have granted relief on this ground, and the Sixth Circuit has "never found a violation" of this sort. *Gaetano*, 942 F.3d at 732.

It is doubtful that case law addressing alleged *preindictment* intrusions applies to the alleged government conduct here, particularly because Henderson insists that his Sixth Amendment right to

counsel had already attached in his money laundering case, (Doc. No. 489 at 26), and because Henderson filed his bankruptcy petition after the criminal complaint against him in his money laundering case was originally filed.  Once the right to counsel attaches, an "invasion of the attorney-client privilege" can violate the Sixth Amendment's right to effective assistance of counsel under certain circumstances.  *United States v. Steele*, 727 F.2d 580, 585 (6th Cir. 1984) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)).

The parties do not address how the interplay between events in Henderson's two separate criminal proceedings might affect the categorization of the right Henderson seeks to invoke.  But regardless whether Henderson's claim is best conceptualized as a Fifth Amendment due process violation for pre-indictment intrusion or a Sixth Amendment right-to-counsel violation for post-indictment intrusion, he cannot prevail without pointing to a purposeful act taken by the government to intrude into the relevant attorney-client relationship.  *See Steele*, 727 F.2d at 586 (finding no Sixth Amendment violation where "[t]here was no evidence presented which showed that the presence of [a confidential informant] was purposefully caused by the government in order to gain confidential, privileged information;" *Gaetano*, 942 F.3d at 732 (rejecting the plaintiff's due process claim because "[t]he government never requested privileged information from" the plaintiff's lawyer).

Here, the relevant attorney-client relationship is the one between Henderson and the attorneys who represented him at his money laundering trial, because it is their assistance Henderson argues was "rendered . . . ineffective."  (Doc. No. 489 at 14)  But Henderson does not assert that a government actor purposefully took action designed to interfere with his relationship with the criminal defense attorneys who represented him during his money laundering trial.  (*See id.*); *Steele*, 727 at 586; *Gaetano*, 942 F.3d at 732.  Instead, he asserts only that "Bryant knew" he had improperly

signed Henderson's name on his bankruptcy declaration "during the money laundering trial and failed to tell Petitioner's [defense] attorneys."  (Doc. No. 489 at 4).

The lack of a nexus between government actions taken to investigate Henderson's bankruptcy petition and the money laundering charges at issue in this case is not surprising.  As the Sixth Circuit explained in its disposition of this case on appeal, "[t]he bankruptcy fraud charge was not mentioned" during Henderson's money laundering trial, and "[h]is civil bankruptcy attorneys were not involved" in that trial either.  *Henderson*, 824 F. App'x at 330.  This lack of overlap between these two sets of charges contributed to my denial of the government's motion for joinder of the two cases.  (*See* Doc. No. 479 at 4).

Nevertheless, Henderson argues government conduct related to the investigation of his bankruptcy fraud case set off a chain of events that had the ultimate *effect* of intruding into his attorney-client relationship in this case:

> "the government . . . intentionally interfere[ed] in Petitioner's relationship with his *bankruptcy attorneys*-aiding them so that the advice-disclosure *given to his criminal attorneys by Petitioner's bankruptcy attorneys* rendered their criminal attorney's advice so ineffective as to amount to an intrusion of the attorney client relationship concerning the Petitioner[']s use of their counsel not to testify in his money laundering trial."

(Doc. No. 489 at 14) (emphasis added).

Henderson cites no case supporting the viability of a "deliberate intrusion" argument based on the indirect effect of government conduct aimed at an attorney who did not represent the defendant during his criminal case, and no Supreme Court or Sixth Circuit case appears to have recognized this type of claim.  Instead, Henderson cites an out-of-circuit district court case, *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991), and argues it is "directly on point."  (Doc. No. 489 at 23).  But it is not.

In *Marshank*, "[t]he government collaborated with Marshank's attorney to build a case against him, to effect his arrest, and to ensure that he would cooperate with the government rather

than contest the charges against him," which "created a conflict of interest between" Marshank and his attorney.  777 F. Supp. at 1519.  The government "was aware of this conflict and took advantage of it," even going "so far as to participate in efforts to mask the conflict of interest from the defendant."  *Id.* at 1519-20.

By contrast, Henderson asserts that his attorneys in his money laundering trial were unable to counsel him effectively because they did not know about supposed government misconduct related to his bankruptcy fraud prosecution.  (*See* Doc. No. 494 at 13).  Unlike in *Marshank*, there is no indication Henderson's defense attorneys in his money laundering prosecution collaborated with the government or that the government engineered and then exploited a conflict of interest between Henderson and his criminal defense attorneys.  And despite his passing reference to the "advice-disclosure" given to his money laundering defense attorneys by his civil bankruptcy attorneys, he does not explain how this alleged communication—from one attorney to another— rises to the level of unconstitutional *government* interference with his right to counsel in his money laundering case.  *Cf. Voigt*, 89 F.3d at 1069 (explaining there was no deliberate intrusion where, "to the extent that [the defense attorney] *disclosed* privileged information . . . it was not at the behest of government agents") (emphasis added).[4]

---

[4]  Henderson also characterizes the government's investigation of his bankruptcy fraud offenses as "outrageous," and he cites cases discussing the "outrageous government conduct defense."  (*See* Doc. No. 489 at 21-22); *United States v. Al-Cholan*, 610 F.3d 945, 952 (6th Cir. 2010).  "Under the outrageous government conduct defense, government involvement in a crime may be 'so excessive that it violates due process and requires the dismissal of charges against a defendant,'" regardless of the defendant's culpability.  *United States v. Flowers*, 712 F. App'x 492, 497 (6th Cir. 2017) (quoting *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011)).  "The Supreme Court has never applied this constitutional variant of entrapment, but has suggested in dictum that it may be available in extreme situations where '[t]he law enforcement conduct . . . [is] shocking to the universal sense of justice.'"  *Al-Cholan*, 610 F.3d at 952 (citing *United States v. Russell*, 411 U.S. 423, 432-32 (1973)) (alterations by *Al-Cholan*); *see also Flowers*, 712 F. App'x at 497.  The Sixth Circuit has also "never applied" this defense and has indicated there are "strong reasons for concluding that such a defense simply does not exist."  *Al-Cholan*, 610 F.3d at 952 (citing *United States v. Tucker*, 28 F.3d 1420, 1427 (6th Cir. 1994)) (quotation marks omitted). (*continued on next page*).

In conclusion, Henderson has not shown that the government intentionally interfered with his relationship with his criminal defense attorneys so as to render their performance constitutionally deficient.  Therefore, I reject his ineffective assistance of counsel claim.

## C.    RIGHT TO TESTIFY

Henderson next argues he was denied the right to testify in his defense because his pending bankruptcy fraud trial made it unwise for him to testify in his money laundering case, "essentially eliminat[ing] Henderson's . . . right in his choice to give testimony in these proceedings."  (Doc. No. 494 at 15).

"The right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant."  *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000) (citing *Rock v. Arkansas*, 483 U.S. 44, 52, 53 n. 10 (1987)) (additional citations in *Webber* omitted).  A district court must take "steps" to "ensure that a defendant has knowingly and voluntarily waived" this right.  *Carson v. United States*, 88 F.4th 633, 645-46 (6th Cir. 2023).

But courts "presume that defense lawyers have discussed the pros and cons of testifying with their clients," and thus "also presume that defendants have knowingly declined to testify whenever they raise no objection to counsel's decision not to put them on the stand."  *Id.* at 646 (internal citations omitted).  As a result, a defendant "must place a desire to testify on the record to show that

---

As I explained above, Henderson may not attack his bankruptcy fraud conviction through a § 2255 motion seeking relief from his money laundering conviction and sentence.  Further, Henderson does not allege the government tried to disrupt his relationship with the criminal defense attorneys who represented him in his money laundering case, and he does not explain how the government was otherwise "involve[d] in" Henderson's conduct leading to his prosecution for money laundering offenses.  *Flowers*, 712 F. App'x at 497.  For this reason, and given the "'moribund' state of" the "outrageous government conduct" defense in the Sixth Circuit, I reject Henderson's argument that "outrageous government conduct" requires relief from his money laundering convictions.  *Al-Cholan*, 610 F.3d 945, 952 (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)).

they have not knowingly waived this right through their conduct (their failure to testify)." *Id.* (citations omitted). A district court need not conduct an "on-the-record colloquy" regarding a defendant's decision not to testify "unless a defendant objects." *Id.*

At trial, I inquired whether Henderson was "satisfied with the advice of [his] counsel concerning the presentation of evidence," which included his "possible testifying as a witness." (Doc. No. 459 at 52-53). Henderson answered, "yes," and he elected not to testify. (*Id.* at 53). Henderson offers no evidence to rebut the presumption that this "tactical decision" was his knowing and voluntary choice. *Webber*, 208 F.3d at 551; *cf. United States v. Campbell*, 86 F. App'x 149, 154 (6th Cir. 2004) (finding the petitioner knowingly and voluntarily waived his right to testify where he "initially asserted that he desired to testify" and where his attorney revoked that decision moments later). Because Henderson chose not to testify after acknowledging he was satisfied with his attorneys' advice, and because he did not "place a desire to testify on the record," I conclude his choice not to testify was knowing and voluntary. *Carson*, 88 F.4th at 646.

Henderson does not argue the colloquy at trial did not reflect his wishes at that time, and he does not argue that his attorneys should have given him different advice under the circumstances. Instead, he insists that his choice not to testify was a "Hobson's Choice"—no real choice at all— because he was forced to pick between testifying in his money laundering case at the risk of incriminating himself for purposes of his pending bankruptcy fraud case, on the one hand, and not testifying in his money laundering case and risking a guilty verdict at *that* trial, on the other. (*See* Doc. No. 494 at 20-22).

No doubt, this decision may have been difficult for Henderson given his complicated legal situation. But Henderson's looming bankruptcy fraud charges were "information that he should have taken into account in making his decision," not unconstitutional coercion. *United States v. Johnson*, 627 F.3d 578, 582 (6th Cir. 2010) (holding the district court's comments suggesting the

downsides of testifying did not "chill" the defendant's right to testify).  Henderson's acknowledgment, in his briefing, that testifying in his money laundering case might have adversely affected his chances in his bankruptcy fraud case further underscores that his choice not to testify was a considered strategic decision.  (*See* Doc. No. 494 at 21-22); *cf. Perotti v. United States*, Case Nos. 1:04-cr-276, 1:08-cv-2478, 2011 WL 2174988 at *6 (N.D. Ohio June 3, 2011) (explaining it was a "reasonable trial strategy" for the defendant to refrain from testifying in order to avoid being cross-examined about his prior convictions).

Henderson "cannot now say, after being found guilty . . . that he wanted to testify" given the absence of any evidence he wished to do so at the time.  *United States v. Viola*, Case No. 1:08-cr-506, 2011 WL 6749643, at *11 (N.D. Ohio Dec. 22, 2011) (finding the petitioner's waiver of his right to testify was knowing and voluntary where he "wanted to take the stand" but chose not to because he "trusted [his attorneys'] judgment").  Because Henderson's waiver of his right to testify was knowing and voluntary under governing case law, I reject his claim for relief on this ground.

## D.    EVIDENTIARY HEARING

Finally, I address Henderson's request for an evidentiary hearing.  (*See* Doc. No. 489 at 1).  "An evidentiary hearing 'is required unless the record conclusively shows that the petitioner is entitled to no relief.'"  *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (quoting *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012)) (additional citations omitted).  "A petitioner's 'mere assertion of his innocence,' without more, does not entitle him to an evidentiary hearing."  *Martin*, 889 F.3d at 832 (quoting *Valentine v. United States*, 488 F.3d 325, 334 (6th Cir. 2007)) (additional citation omitted).  "But when presented with factual allegations, 'a district court may only forego a hearing where "the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Martin*, 889 F.3d

at 832 (quoting *MacLloyd v. United States*, 684 F. App'x. 555, 559 (6th Cir. 2017)) (internal quotation marks and further citation omitted).

As I have already explained, Henderson's ineffective assistance of counsel and right-to-testify claims fail as a matter of law, and his arguments attacking his bankruptcy fraud case are procedurally barred.  The record of this case and governing case law thus "conclusively show[] that the petitioner is entitled to no relief" as to those claims, so an evidentiary hearing is not warranted on those grounds.  *Martin*, 889 F.3d at 832 (citations and quotation marks omitted).  Henderson nevertheless argues he is entitled to an evidentiary hearing at which he would present his own testimony that he lacked knowledge of Wittenmyer's fraud scheme:

> "[Henderson] would have rejected his attorneys' advice not to testify in these proceedings. He would have testified to the matters at issue involving any claimed conspiracy to launder the $500,000 using his personal or FLT Properties bank account and directly testified to his belief and conduct creating reasonable doubt to any knowledge or intent by him to join or aid Wittenmyer in his crimes by providing him banking access.
>
> Henderson would have testified he believed Wittenmyer was repaying him for allowing his stay in the detached part of his home for almost two years during his divorce without paying rent, with Henderson supplying groceries, and other incidentals.
>
> Most importantly, he would have explained why funds were disbursed in the amount and in the manner undertaken by him at the direction of Wittenmyer, again providing the jury with a different or alternative set of facts constituting reasonable doubt as to his guilt he conspired with Wittenmyer, explaining why he took money as repayment of less than $70,000 creating reasonable doubt about whether the funds were repayment of Wittenmyer for Henderson's expenses of criminal in their receipt. He would have explained the source of the $500,000 as he understood it to be and the reason[] he took directions [from] Wittenmyer concerning payments to third parties."

(Doc. No. 494 at 17).

I note that while Henderson makes these assertions in his briefing, he cites to no source of evidence—not even an affidavit of his own—to support them.  (*See id.*); *cf. Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (finding the district court should have held an evidentiary hearing

regarding an ineffective assistance of appellate counsel claim where the defendant filed an affidavit containing "a narrative of the defendant's dealings with his appellate counsel" that was not "inherently incredible").  Additionally, his assertion he "would have explained why funds were disbursed in the amount and in the manner undertaken by him at the direction of Wittenmyer" is conclusory and is thus not a proper basis for holding an evidentiary hearing.  *See Martin*, 889 F.3d at 832 (internal citation omitted).

Henderson provides the following specifics regarding the content of his proposed testimony: "Henderson would have testified he believed Wittenmyer was repaying him for allowing his stay in the detached part of his home for almost two years during his divorce without paying rent, with Henderson supplying groceries, and other incidentals."  (Doc. No. 494 at 17).  Even assuming this would have been Henderson's testimony if he had chosen to testify at that time, it is contradicted by the record of the case.

To begin with, no evidence presented at trial supports the assertion that Henderson believed the nearly $500,000 Wittenmyer transferred to him was payment for rent, groceries, and other incidentals.  The jury heard no evidence of any such agreement, formal or informal.  The jury heard no evidence of any intent by Wittenmyer to compensate Henderson for providing him with groceries, incidentals, or a place to live, and no evidence was offered at trial suggesting Henderson had an expectation that Wittenmyer would do so.

More importantly, the evidence presented at trial clearly contradicts Henderson's assertion that he believed the $500,000 was a legitimate payment for rent, groceries, and incidentals.  First, agent Eric Robinson testified he told Henderson that RM Capital, the entity associated with Wittenmyer that sought to purchase the $1.7 million home for which Henderson was the realtor, "would not have $2 million to pay for this, that the only funds that had passed through it at all were recent stolen funds . . . that Wittenmyer had long been involved in theft of funds and that he had no

income other than what he had taken from others." (Doc. No. 457 at 45). When Robinson called Henderson on November 20, 2013, to ask "if he had any knowledge of money coming through any of his bank accounts that might belong to Mr. Wittenmyer," Henderson said "[h]e knew nothing of that" but also stated he "had lent some money to Mr. Wittenmyer in order to help him out." (*Id.* at 49). Yet the FTL Properties bank account in Henderson's name had received a wire transfer for nearly $500,000 two weeks before Henderson told Robinson he did not know about any such transfer coming from Wittenmyer. (*See id.* at 58-59). Robinson also testified that Henderson did not report the $500,000 payment as business income from his rental properties on his 2013 tax return. (*See id.* at 92-93).

Other witnesses gave testimony that undermines Henderson's assertion he believed the $500,000 payment was for housing-related services. Jeffrey Lasman, the closing attorney for the purported bond sale, testified that Henderson was on a conference call where Lasman discussed the payment of a commission into Henderson's FTL Properties bank account for the bond sale. (*See* Doc. No. 458 at 87-89). Ali Moubarak, Henderson's former romantic partner, testified that Henderson told him he "couldn't understand where it came from or what the deal was behind it because . . . Mr. Wittenmyer was the one organizing." (*Id.* at 110). Finally, Christina Perry, whom Henderson called as a witness, testified that Wittenmyer became "furious" with Henderson for taking a friend to dinner in Ann Arbor, Michigan and exclaimed, "Your brother went out and spent my money." (Doc. No. 459 at 67-68).

Henderson's denial that he knew anything about a $500,000 payment from Wittenmyer, and his intimation that any money from Wittenmyer may have been related to a loan, is inconsistent with his assertion, in his briefing, that he believed the $500,000 from Wittenmyer was a payment for rent, groceries, and other incidentals. Likewise, the testimony from Lasman and Moubarak contradicts the assertion that Henderson believed the $500,000 was a payment for rent and other related

20

services.  Finally, Wittenmyer's anger with Henderson for spending what Wittenmyer apparently perceived to be his own money also undercuts Henderson's assertion that he believed Wittenmyer paid Henderson $500,000 in compensation for allowing Wittenmyer to stay in his home.

Because the evidence presented at trial about Henderson's knowledge regarding the source of the funds he received from Wittenmyer directly contradicts what Henderson claims his testimony would have been, an evidentiary hearing is not warranted in this case.  *Cf. Cox v. Jenkins*, Case No. 3:15-cv-098, 2015 WL 5842734, at *8 (S.D. Ohio Oct. 6, 2015) (*report and recommendation adopted by Cox v. Jenkins*, 2016 WL 524385 (S.D. Ohio Feb. 10, 2016) ("The defendant is not entitled to claim that a victim's testimony is not credible on the basis of hypothetical testimony he or she could have given but did not give because of exercising the Fifth Amendment right not to testify")).

## V.  CONCLUSION

For the reasons stated above, I deny Henderson's motion for relief and request for an evidentiary hearing under 28 U.S.C. § 2255.  (Doc. No. 489).  In addition, I deny Henderson's motion requesting a status update on his 2255 petition as moot.  (Doc. No. 495).


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge